REEDER, Respondent, v. CRYSTAL CARBONATE
LIME COMPANY, Appellant.

St. Louis Court of Appeals, February 4, 1908.

1. MASTER AND SERVANT: Safe Appliances: Selection of Appliance by Fellow-Servant. The duty of the master to furnish the servant with reasonably safe appliances is discharged when plenty of suitable appliances are furnished, although a fellow-servant may select from such appliances one which is unsafe thereby leading to an accident; in such case, if the injury results to an employee, it will be imputed to the negligence of the fellow-servant instead of the master.

2. ————: ————: ————. But where, from a mass of defective appliances furnished by the master, a servant selects the best appliance he can find and it proves to be defective, causing an injury to a fellow-servant, the injury is due to the negligence of the master; the operator of a stone quarry put a gang of men to raising a derrick by means of a rope and pulley and furnished a lot of rope which had been discarded as unsafe for another purpose, and some one of the employees selected what appeared to be the safest rope; the rope broke while they were attempting to raise the derrick, causing an injury to another employee. Held, the employer was negligent and liable to the injured employee for the injuries.

3. ————: ————: Contributory Negligence. In such case where it was shown that the rope had broken once before the accident and was tied by the employee injured by the second breaking, he was not guilty of contributory negligence as a matter of law in continuing in the service after the first breaking of the rope.

Appeal from Lincoln Circuit Court.—*Hon. Jas. D. Barnett*, Judge.

AFFIRMED.

*McKeighan & Watts* and *Wm. R. Gentry* for appellant.

The demurrer to the evidence should have been sustained. First. Because no negligence of defendant alleged in the petition was proven. If any negligence was

proven, it was the negligence of Ferry, who was a fellow-servant with plaintiff. Hebert v. Wiggins Ferry Co., 107 Mo. App. 287; Forbes v. Dunnavant, 198 Mo. 193. Second. Because, according to the plaintiff's account of the accident, plaintiff was guilty of such contributory negligence as to bar a recovery by him. Conroy v. Iron Works, 62 Mo. 35; Huhn v. Railroad, 92 Mo. 440; Woerheide v. Car & Foundry Co., 32 Mo. App. 367; Adams v. McCormick, etc., Co., 95 Mo. App. 111; Shortel v. St. Joseph, 104 Mo. 114.

*Dudley & Palmer* for respondent.

(1) Defendant failed to furnish suitable appliances. The ropes were rotten or worn. This was a non-assignable duty of the master. Jones v. Packet Co., 43 Mo. App. 405; Henry v. Railroad, 109 Mo. 488, par. 3, p. 494; Bradley v. Trorlicht, 49 Mo. App. 214, par. 9, p. 231; Railway v. Herbert, 116 U. S. 642, 6 Sup. Ct., 59 and cases cited; Sachowitz v. Mfg. Co., 78 Mo. App. 144; Zellars v. Water and Light Co., 92 Mo. App. 107; Goins v. Railroad, 37 Mo. App. 675; Rowland v. Railroad, 20 Mo. App. 463; Brothers v. Carter, 52 Mo. 372; Gornely v. Iron Works, 61 Mo. 492; Chenoweth v. Sutterland, 101 S. W. 1105; Combs v. Construction Co., 104 S. W. 77. (2) Plaintiff assumed no risk arising from the negligence of defendant. Garcia v. Construction Co., 102 S. W. 594, and cases there collected. (3) The dangers from the defective rope were not glaringly apparent—contributory negligence was a question for the jury.

GOODE, J.—While working for defendant plaintiff's foot was badly mashed in an accident and this action was instituted to recover damages. Defendant is an incorporated company engaged in quarrying stone and manufacturing stone products. It has a quarry and works at Elsberry, in Lincoln county, and the accident

occured there. It will be difficult to impart an accurate
notion of the scene and details of the occurrence without
the aid of pictures. Photographs were submitted to the
court to assist in understanding the facts, but these can-
not be reproduced in this opinion. Immediately ad-
jacent to a rocky bluff stood a rock-crushing plant, op-
erated by the defendant company. The building in
which the crushing machinery was situate was rather
tall and its sides were formed of upright boards. In
the rear of this building was a much lower building in
which were the boiler and furnace of the mill. This
house was called the boiler house, and, as said, was im-
mediately in the rear of the building in which the crush-
ing machinery was contained. It stood against the side
of quite a dump or fill on which was laid a tramway used
for conveying rock from the quarry to the crushers. The
tramway and the dump on which it stood ended at a door
in the rear and at one side of the main building. There-
fore the boiler house was against the side of the dump
and was built so its eaves were almost on a level with
the top of the dump and tramway. In January, 1906,
changes had been made in the machinery and equipment
of the mill, rendering it necessary to erect an additional
smokestack which would project through the roof of the
boiler house. One was procured about fifty feet long
and two feet in diameter, and conveyed along the tram-
way until it was opposite the boiler house, when one end
was laid on the roof of this building and the other left
on the tramway preparatory to raising it in position
and anchoring it. In order to do this it was necessary
first to put in position, projecting through the roof of
the boiler house, a massive upright pole denominated by
the witnesses a "gin pole." As we understand, the func-
tion of the gin pole was to act as a sort of derrick and
leverage on which to pull in lifting the smokestack. The
employee in charge of the operation of putting the
smokestack in position was a mill-wright by the name

of Feary, who testified he had been working for defendant two years in any capacity and as a common laborer. Feary was directed by the president and general manager of defendant company to procure a suitable pole, and had cut in the woods a small tree about twenty-eight inches in diameter at the butt and about forty feet long, to use in lifting the smokestack. This pole was hauled up the tramway to the eaves of the boiler house and five other employees besides Feary were summoned to aid in raising it. Among those summoned was plaintiff who, at the time, was doing other work and uttered an expression of unwillingness to assist in raising the pole, but was told he was ordered to do so by Mr. Pratt, the general manager. Roy Pratt, son of Ivan E. Pratt, the manager, was at the spot when the employees were about to raise the pole. The testimony is that the younger Pratt acted as boss or manager when his father was not about. Feary told Roy Pratt ropes were needed wherewith to raise the pole, and Pratt said there was a carload of ropes in the toolhouse and for Feary to get what he needed there. The ropes in the toolhouse were cast-off articles which had been used in drawing cars up the tramway. When they became too worn and weak for further use in pulling the cars, they were thrown into the toolhouse. Feary selected three ropes from those pointed out to him, and swore those he selected looked to be the strongest and best in the toolhouse. They were adjusted to the pole, and while pulling on them and when the pole was nearly in an upright position, one of them broke, letting the pole drop on the roof of the boiler house, where it struck the end of the smokestack which lay on the roof, jarring it so it slid off and fell on plaintiff's foot. Plaintiff at the time was assisting in raising the pole and was standing on the tramway near the eaves of the boiler house. Three witnesses testified the rope broke twice, once before the pole fell, and that when it broke the first time Roy Pratt ordered plaintiff to tie it and proceed

with its use and plaintiff obeyed the order. The other witnesses who were present testified it only broke once.

Four charges of negligence are made in the petition, but as one of them was abandoned during the trial, we will omit it from the statement. The first act of negligence assigned is the failure of defendant to provide suitable guy ropes to support the gin pole while it was being raised. The second assignment is the failure of defendant properly to secure and block the smokestack as it lay on the boiler house while the workmen were raising the pole. The smokestack had been blocked by Feary, who testified he placed a two-inch block under the end which lay on the roof of the boiler house. The third assignment of error was placing the gin pole so it rested on the elevated tramway while being raised, and in a position too near the smokestack, thereby endangering the workmen who were to raise, first the pole and then the smokestack. We will dismiss the second and third assignments with the statement that we do not consider either the proximity of the pole to the smokestack or the inadequate blocking of the latter, was the proximate cause of the accident which was, unquestionably, due to the breaking of the rope. For aught that appears the stack would have remained securely on the roof until it was lifted, if it had not been thrown off in the manner stated; an occurrence due to the rope breaking while the workmen were pulling on it in an attempt to raise the pole. During the entire operation Roy Pratt was present and Ivan Pratt, the president and general manager of the defendant company, came to the scene before the pole was raised and looked on, simply as a spectator, he said, the job being in charge of Feary. The upshot of Ivan Pratt's testimony in this connection is that he knew nothing about such work and was curious to see it done, and therefore stood by, but exercised no superintendence over the property in the jack until the full purchase price was

men. A verdict was returned in plaintiff's favor for $750.

Two points are relied on for a reversal; that whatever negligence was proved was on the part of Feary, who was a fellow-servant of plaintiff, and that plaintiff was guilty of contributory negligence. We think neither of these points will hold good and justify a reversal of the judgment. Whether in truth Feary was a fellow-servant of plaintiff, or a vice-principal in the particular work, need not be determined. He was in charge of the operation; and as an expert mill-wright presumably was familiar with how it ought to be done. At any rate, he was in authority and plaintiff was obeying his orders and expected to obey them. But as the court below treated him as a fellow-servant of plaintiff in instructing the jury, we will accept this view of their relationship in examining the points raised. The chief proposition of defendant's counsel is that the proximate cause of the accident, if due to anyone's negligence, was the fault of Feary in selecting a weak rope from the supply on hand when he might have selected a strong one. It is further said the duty of a master to furnish his servants with reasonably safe appliances, has been sufficiently discharged to exonerate the master from liability, when plenty of suitable appliances are furnished, even though some fellow-servant of the injured party may select for use from among the lot of appliances furnished, one which is unsafe and thereby lead to an accident. We are pointed to the decisions in Herbert v. Ferry Co., 107 Mo. App. 207, 80 S. W. 978, and Forbes v. Dunnevant, 198 Mo. 193, 95 S. W. 934, as authorities supporting this proposition and precedents for the decision of the present case. The general doctrine of law is declared in those cases as contended for by plaintiff. But the Forbes case bears no resemblance to this one and the Herbert case no resemblance except that the plaintiff therein was

injured by the breaking of a rope. This case is distinguished by a controlling fact from both. In those cases it was conclusively proved the employer furnished plenty of material out of which to select a safe appliance, but fellow-servants of the injured parties carelessly selected from the material furnished, unsafe and dangerous appliances when safe ones lay before their eyes. In the Forbes case the plaintiff was injured by falling from a scaffold on which he was working, in consequence of one of the timbers on which the scaffold rested, breaking. It appeared a co-workman of Forbes had picked a bad board from a lot of good material, and used this board in constructing the scaffold. The breaking of the board caused plaintiff's fall. Herbert was injured by the fall of a dismantled wheel of a steamboat. The wheel had been tied in place by the men working on it by an old and worn rope. The condition of the rope was visible and was known not only to the man who chose it, but to those working on the wheel, including plaintiff. After finding the breaking of the rope was the proximate cause of the accident, this court said the evidence showed conclusively there were ropes on hand and accessible to the men, which would have held the wheel and could not possibly have broken; that the men knew where such ropes were and could have gotten them. The selection of the weak and worn rope to tie the wheel from a supply of sound ones, we held to be negligence on the part of the servant who made the selection, and that the master had performed his duty to furnish his servants reasonably safe appliances, by procuring and having accessible a sufficient supply of good ropes. The law of negligent torts is replete with rules which are contradictory in their essential principles. Among these conflicts are the doctrines of contributory negligence and the last fair chance; the master's duty to use care to furnish his

servants with safe tools and the latter's voluntary assumption of the risk of working with a certain tool; *respondeat superior* and the non-liability of an employer for the negligence of a fellow-servant; the liability of one who has work done for damage occurring in the course of it as affected by letting it to an independent contractor. Instances often arise in which the facts appear to bring two opposed rules into direct conflict and to fall within the principle of both. In the decision of these causes the best a court can do is to give the diverse rules a reasonable application so as to serve practical needs rather than harmony of theory. The words of Lord Chancellor HALSBURY in Quinn v. Leathem (App. Cas. 1901, pp. 495, 506), are apropos just here: "A case is only an authority for what it actually decides. I entirely deny that it can be quoted for a proposition that may seem to follow logically from it. Such a mode of reasoning assumes that the law is necessarily a logical code, whereas every lawyer must acknowledge that the law is not always logical at all." It is universally held that the duty rests on an employer to exercise care to furnish his employees reasonably safe tools and working appliances. If this duty is shifted to a subordinate who fails to observe it, and a servant is injured in consequence of the failure, the subordinate will be regarded as so far the representative of the master that the particular neglect will be treated as the master's and not a fellow-servant's, and damages may be recovered by the injured employee. [1 Bailey, Mas. & Ser., sec. 241; Browning v. Railroad, 124 Mo. 55, 27 S. W. 644.] Yet a limit is set to the application of this rule. If the employer furnishes his employees with a mass of safe material or appliances, but containing perchance an unsafe article or two, and an employee is injured because, out of the mass, some fellow-employee carelessly took for use the unsafe article, and in consequence the casualty happened, this injudicious choice

will be imputed to the fault of the fellow-servant, instead of the master, and the latter held not responsible for the damages. [1 Bailey, sec. 268; McKinney, Fellow-Servants, p. 68; Bowen v. Railroad, 95 Mo. 268, 8 S. W. 230; Armour v. Hahn, 111 U. S. 313; Harms v. Sullivan, 1 Ill. App. 251.] Though the reason of the exception to the general rule is clear, great difficulty is often experienced by the courts in saying whether the exception or the rule should govern the decision on a given state of facts. Both the general fellow-servant doctrine and the secondary rule we are dealing with, are founded on expediency; the intention of the law being to place duty and responsibility where they may be exercised most effectively for the security of all concerned. [McKinney, Fellow-Servants, p. 18; Farwell v. Railroad, 4 Metc. (Mass.) 49.] In carrying out this policy the duty of using care to furnish reasonably safe appliances is rightly imposed on the master, because likely he will insist on purchasing the machinery and tools to be used in his own business, and his employees naturally will look to him, and not to a fellow-servant to use care to select safe ones. But an employer who procures a mass of material or many appliances to be used by his servants and places the supply where the servant may choose from it as needed, cannot be expected, ordinarily to inspect each tool or piece of material before it passes into use. The usual and natural course of business makes it necessary, in order for work to be performed with reasonable dispatch, to entrust discretion to the employees themselves in selecting an appliance from the lot furnished and in putting together crude materials. [Bowen v. Railroad, supra.] Of course there may be an extensive and systematized business, like a great railroad, in connection with which the duty of having tools and appliances inspected by independent experts before they are employed in the work of the railroad, is expected of the master. But we are not dealing with so

complicated an enterprise as to require an independent inspection of instrumentalities prior to permitting employees to use them, and if plenty of good ropes had been accessible, maybe defendant would not have been held liable for the careless choice of a poor one by Feary. But the ropes Feary was ordered to choose among had been discarded as unfit for their original use, and were worn and weak. Feary testified he selected the best ones he could find; and this testimony shows a palpable breach of duty on the part of defendant to furnish plaintiff a reasonably safe rope with which to work. Though we find no evidence to prove Feary made an unwise selection, yet the court, in an instruction given at defendant's request, advised the jury if they found Feary had access to good ropes which were suitable for raising the pole, but selected the rope which broke out of a large number in the warehouse, using his own judgment, the verdict must be for defendant, unless the jury found the general manager Pratt was in charge of the work at the time and by ordinary care might have known said rope was not suitable. The instructions on the defense that plaintiff's injury, if not due to his own negligence, was due to a fellow-servant's, were quite favorable to defendant.

But it is insisted plaintiff was conclusively shown to have been guilty of negligence contributing to his injury. This proposition is based on the fact that the rope broke twice; once before the casualty happened as well as when it occurred. When it first broke plaintiff was ordered by Pratt to tie it and did so, and in continuing to work with it thereafter, it is argued he was negligent. This issue was fairly put to the jury in several instructions, of which defendant's counsel disclaim criticism, as they do of all the instructions. Hence, unless we can say the only inference from the facts in proof is that the hazard of again using the rope after it had once broken was so great and ap-

parent that no person of ordinary prudence would have incurred it, we must approve the way the court submitted this issue to the jury. In our opinion a court cannot say as a legal conclusion, that continuing to work with the rope after it had broken under the strain put on it, was an act so reckless that no prudent man would have done it. To say so we should have to hold no other inference was possible, although all the men who worked on the job, including the expert mill-wright, were not deterred from further use of the rope. Plaintiff might well have believed the rope would hold even though it had broken once; or that if it broke again, no one would be injured, as no one was injured the first time. The question of plaintiff's contributory negligence was, at best, one for the jury.

We have carefully studied the evidence in this case and the instructions to the jury, which were noticeably perspicuous and accurate and presented all phases of the case in a clear light. No complaint is made of the amount of the verdict, and as the finding of the jury was well supported by the testimony and no reversible error occurred in the court's rulings, the judgment will be affirmed. All concur.