WILEY B. SMITH, Respondent, v. UNION ELEC-
TRIC LIGHT & POWER COMPANY, Appellant.

St. Louis Court of Appeals. Argued and Submitted March 16, 1910.
Opinion Filed May 17, 1910.

1. MASTER AND SERVANT: Negligence: Injury to Servant: Defective Scaffold: Instructions: Assuming Facts. In an action by a servant against the master for personal injuries received by the former, due to the breaking of a plank on a scaffold, on which he was working, an instruction which assumed defendant had provided and furnished the plank for use on the scaffold was erroneous as assuming that fact in the absence of any evidence to justify it.

2. ———: ———: ———: Defective Appliances: Liability of Master. The master is liable for injury to a servant only when either actual knowledge of the defective tool or appliance causing the injury is brought home to him, or such facts are in evidence as warrant the jury in assuming he has or should have such knowledge.

3. ———: ———: ———: Defective Scaffold: Master's Negligence not Shown: Facts Stated. A steamfitter gang, of which plaintiff was a member, in the employ of defendant in the construction of a coal tower, was told by defendant's foreman to mount a certain scaffold, on which there was a platform consisting of six planks, and run some pipes, and when they finished there to go to another scaffold and run some pipes there. The steamfitters on going to the second scaffold and finding no platform on it, told the carpenters, who had already carried away four of the six planks from the first platform, to leave the other two. The steamfitters, in the absence of the foreman, without any direction having been given them as to what planks they should take or where they should get them, used these two planks, though there was plenty of material on the floor below that on which they were working, for the platform of the second scaffold, and one of the planks, which was cross-grained and contained a knot, broke when the plaintiff stepped on it. Held, there was no evidence that defendant furnished these particular planks to the steamfitters with which to build a platform on the

second scaffold, and that plaintiff, without directions from defendant, having selected the defective plank, and knowledge of the defect not being brought home to defendant, plaintiff was not entitled to recover.

4. ——: ——: ——: ——: **Contributory Negligence.** It being further shown that plaintiff selected the plank and used it without any examination as to its condition and that a slight inspection on his part would have shown him it was unsafe, it is *held* that his injuries were caused by his own carelessness.

### On Motion for Rehearing.

5. ——: ——: ——: ——: ——. The first scaffold, from which the planks were taken, having three supports to rest upon, one of which was in the middle of the plank, and the second scaffold, on which the plank rested when it broke, having only two supports, one at either end of the plank, and none under the middle, it cannot be inferred that because the plank had been safely used on the one scaffold plaintiff was warranted in using it on the other, since, when it broke, plaintiff was standing near the middle of it, where there was the most strain and least support, whereas, on the other scaffold, it had been supported in the middle by a joist.

### Dissenting Opinion by Nortoni, J.

6. ——: ——: ——: ——: **Master's Negligence Question for Jury.** The direction of defendant's foreman to plaintiff and his companion steamfitter to use the standing scaffolds in performing their task of fitting steam pipes was an assurance by the master that they were reasonably safe for the purpose intended and that the boards on top of them, on which the servants were to stand and walk, were reasonably safe for that purpose, although the scaffold on which plaintiff was injured was not pointed out by the foreman—the board which broke, however, having been in use on the scaffold which was pointed out and removed by plaintiff to the scaffold on which he received his injury; and hence it was for the jury to determine whether or not defendant was liable.

7. ——: ——: ——: ——: **Contributory Negligence Question for Jury.** Others having used the plank in the scaffold, an ordinarily prudent person would not have scanned it for defects as closely as he would on selecting it in the first instance, and it being rough on one side and discolored by use on the other so that the knot which occasioned its breaking was concealed and hence not likely to be discovered upon such an inspection as an ordinarily prudent workman would have made under the circumstances, plaintiff should not be adjudged guilty of contributory negligence as a matter of law.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

REVERSED.

*Seddon & Holland* for appellant.

The court erred in refusing to give, at the close of all the testimony, the instruction in the nature of a demurrer to the evidence offered by defendant and refused by the court. Bowen v. Railroad, 95 Mo. 277; Herbert v. Ferry Co., 107 Mo. App. 287; Forbes v. Dunnavant, 198 Mo. 193; McGinnity v. Reservoir Co., 155 Mass. 183; O'Connor v. Rich, 164 Mass. 560; Adasken v. Gilbert, 15 Am. Neg. Rep. 594; Johnson v. Towboat Co., 135 Mass. 290; Miller v. Railroad, 175 Mass. 363; Colton v. Richards, 123 Mass. 484; Kelly v. Norcross, 120 Mass. 508; Allen v. Iron Co., 160 Mass. 557; Dewey v. Parke, Davis & Co., 76 Mich. 631; Hoar v. Merritt, 62 Mass. 386; Beesley v. Wheler & Co., 103 Mich. 196; Cregan v. Marston, 126 N. Y. 568; Pfeiffer v. Dialogue, 8 Am. Neg. Rep. 90; Hayes v. Railroad, 17 Am. Neg. Rep. 544; Callahan v. Trustee, 180 Mass. 183.

*Earl M. Pirkey* for respondent.

(1) "If the master undertakes to furnish structures to be used by the servant in the performance of his work, the master must use due care in the erection of the structures, and, if there is negligence on his part, or negligence on the part of some one representing him in that respect, he is liable for injuries sustained by the servant." Bowen v. Railroad, 95 Mo. 277; Combs v. Construction Co., 205 Mo. 367; Kennedy v. Gas Light Co., 215 Mo. 704, where it is said: "When the preparation of the appliances is neither entrusted to nor assumed by them, the master may be held guilty of negligence, if defective appliances are furnished, even though the workmen themselves are employed in the

preparation of them." 26 Cyclopedia of Law and Proc., p. 1115; Doyle v. Trust Co., 140 Mo. 1. (2) There is no obligation resting on the servant to inspect a scaffold furnished for his use by the master. 2 Labatt on Master and Servant, p. 1145, par. 410. (3) Where the appellant assigns for error the action of the trial court in refusing a demurrer to plaintiff's evidence he must set out the whole evidence in *haec verba* in his abstract or the appellate court will not consider the assignment. Nash v. Brick Co., 109 Mo. App. 600.

STATEMENT.—Respondent in his petition on which the case went to trial states that he was in the employ of appellant as a steamfitter's helper at work on a coal tower which defendant was erecting in the city of St. Louis. That he was at work in one of the apartments of the coal tower, engaged in running or placing pipes some distance above the floor of the apartment, and was working on a scaffolding covered with planks. That this scaffolding was in a defective and dangerous and not reasonably safe condition for plaintiff to work on or to use in doing his work by reason of one of the planks being at the time in a defective, dangerous and not reasonably safe condition for use in the platform; was unsound, weak and not of sufficient strength to bear the weight incident to its ordinary and reasonable use in the platform or to bear the weight of plaintiff when using the platform, it having knots in it and cut across the grain. That defendant knew or by the exercise of ordinary care could have known of the defect in the plank and of its dangerous character in time to have remedied the unsafe condition of the platform, but negligently failed to do so and negligently furnished it to plaintiff to work upon. That while plaintiff was at work on the platform and in the exercise of due care and without knowledge of the defect in the plank, it broke under plaintiff's weight and he fell and was injured, to his damage, etc.

The answer was a general denial and plea of contributory negligence of plaintiff in selecting and using the plank.

The reply was a general denial.

At a trial before the court and a jury there was testimony for plaintiff tending to prove the following facts: That on January 24, 1908, defendant was in possession and control of a plant at the foot of Ashley street, in the city of St. Louis. Adjoining this building was a coal tower, which it was erecting and which was completed in a general way so far as the outside structure was concerned, and defendant was engaged in finishing the inside parts; plaintiff was a steamfitter's helper in the service of defendant; in one of the rooms of this coal tower there was a contrivance, known as a chute or hopper, which came through the ceiling at about the middle of the room and extended from the ceiling a few feet toward the floor, but did not reach to the floor; on January 24, 1908, the day of the injury, there was a scaffold on the west side of this hopper and within reach of the ceiling, this scaffold was composed of three timbers at about an equal distance apart running east and west and supported from beneath, and on those timbers in a north and south direction were laid planks or boards, composing the platform of the scaffold, these boards were from twelve to fourteen feet long, six inches wide and two inches thick. South of the hopper were two supports at about the height of this scaffold and from six to nine feet apart. The boards on the scaffold were loose, as they were on all scaffolds that had been used while plaintiff was in the service of defendant, which was about eighteen months, and during such time it was customary for the men using the scaffold to shift the planks of the platform to such position as their work required, shifting from one scaffold to another. Plaintiff was a helper, working with a steamfitter named Gallagher and with another helper named Altman. The three were under a foreman named Saffley,

who in turn was under a superior named Tenney. On the day of the injury, Tenney directed this steamfitter gang to mount the scaffold west of the hopper and run some pipes and also directed them when that was done to run a line of pipes south of the hopper. Saffley also directed the same and supervised the steamfitting work while it was going on, but was not present when the boards were put on the scaffolding by plaintiff and his fellow-fitters nor when plaintiff fell and was injured, nor had he, Tenney, or any other superior, given any directions in connection with the selection or placing of the boards on the scaffold. That was left to the steamfitters gang, composed of Gallagher, and plaintiff and Altman. Pursuant to these orders, Gallagher and the two helpers mounted the scaffold west of the hopper, ran the pipe line directed, then having finished this and left that scaffold, prepared to run the pipe line south of the hopper. To run this it was necessary to work from a scaffold which was there in place, but without any platform or boards on it. It was about the noon hour when the pipe line on the west was finished by these fitters. The carpenters who built the scaffold on the west side, supposing the steamfitters were through with it, and intending to take the boards which made its platform for use elsewhere, started to remove the boards composing this platform of the west scaffold. The platform was composed of six boards. When the carpenters were in the act of removing them and had carried off four of them, Gallagher told them that he was not through running pipe and to leave two boards for them.

The foregoing is in the main taken from the statement of counsel for respondent. Referring to the abstract of plaintiff's own testimony as contained in the additional abstract furnished by his counsel, it appears that the carpenters left or turned over to the fitters two planks, whereupon plaintiff and Altman took these

two planks which had been on this west scaffold and carried them around and put them on the top of the scaffold on the south side of the chute. One of the carpenters who had been working there took them off of the scaffold and gave them to these pipefitters. Plaintiff was up on the scaffolding and Altman and Gallagher handed the planks up to him. Plaintiff laid the planks, putting down one while Altman, the other helper, put the other end of the plank in position. Altman and Gallagher handed the plank up to plaintiff who took hold of it and put it in position, first putting up one and then the other. Plaintiff testified that he did not see anything wrong with either of the planks that Gallagher handed to him; they appeared all right to him and he supposed they would to anybody. After laying the plank on the scaffold he stepped out on it and it broke, throwing him to the floor below. The plank was about fourteen feet long and it broke close to the middle and while plaintiff said he could see to the middle of it very well, while he was handling it and putting it in position, he did not notice anything wrong with it, just gave it a passing glance; knew that it was important to have a strong plank as they were going to stand on it but paid no attention to see whether it was strong or not, just supposed it was all right. Up to the time it broke it had looked all right. After it broke he noticed the knot in it which was nearly halfway across the 2x6 width of the plank; it went clear through the timber; had also noticed that this plank was cross-grained, noticed that after the accident. If he had looked for the knot or cross-grain before the accident and looked close he could have seen both; could see it better from the smooth side which was under than from the rough side which was on top, although the smooth side was covered with cement. One of the carpenters came and took away four of the six planks that had been left on the scaffolding at which plaintiff and the fitters had been working before lunch. (That is the west scaffold). He came

back to get the other two and Gallagher said, "Leave those two there. We want to put the pipe up here." The carpenters had intended to take them all somewhere else. They had these two planks in their hands carrying them away and when Gallagher asked them to let him use them they turned them over to him and he, plaintiff, and Gallagher and Altman put them in position on the south platform. There was a good deal of plank and timber around the building at that time, quite a number of these two-inch thick and six-inch wide and twelve or fourteen feet long planks in different parts of the building, but most of them were down stairs, about sixty or seventy feet from where plaintiff was and where they were putting the planks on the scaffolding; if he had noticed the knot in the plank and the cross-grain and considered it dangerous, could easily have got some other plank within a short distance, sixty feet, by drawing them up with a rope, that is, they were on the floor below where plaintiff was at work. The carpenters employed about the building had built all of the scaffolds and all the frame work and then the different men that came along, iron workers or pipefitters, would move the planks about to suit themselves. Plaintiff and the two pipefitters with him had frequently moved the planks from one scaffolding to another; these six planks that had been on the west scaffolding had been left there by the carpenters who had been doing some carpenter work. When plaintiff and his fellow pipefitters on the occasions referred to moved the planks about and put the planks on the scaffolding, they would get them off of one platform and move them around to another one; had never noticed any of the planks to be bad on the scaffolding when they were moving them but if they had wanted to and had seen one of them bad he supposed that they could easily have got a good one somewhere else; there were always more planks than they actually used; they had six planks on the scaffold west of the hopper and if one of them had been bad they could

have taken it off and stood it on top of another and if they were moving two away from the six to use on the south side they could pick out two good ones.  He repeated that Mr. Saffley or Mr. Tenney were not around when he got hurt.  Tenney was the overseer of all the construction of the steam work and laid out the work; he was foreman of the steamfitters and Saffley was his assistant.  This crew of pipefitters had done pipefitting on the west side a day or two before, working at it from the platform on the west side of the chute and during that day had used the six planks which formed the platform of that scaffold; had not noticed anything wrong with any of these planks and they took two of those from the carpenters to use on the south scaffold when ready to work there.  So much is the substance of plaintiff's own testimony now material to quote.  Resuming the testimony as set out by plaintiff's counsel, the planks were of yellow pine, about twelve or fourteen feet long, six inches wide and two inches thick. There was evidence that a board of the dimensions of the board in question would be sufficient if of sound and good lumber to carry the weight of plaintiff even if placed on supports farther apart than those on which the board was resting when it broke.  Plaintiff testified that he was not a carpenter and never worked in timber and knew nothing about timber.  The scaffold west of the hopper was built by the carpenters and plaintiff was directed, as above mentioned, to use it and then run the pipe line south of the hopper, and it had been the custom for the steamfitters to shift the planks composing the platform as their work required.   The lumber composing the entire scaffold was all windshaken, knotty and inferior.  The board that broke was rough on one side and the other side was smooth but had become dirty from being in contact with concrete. On the rough side, which was up while plaintiff was working, the knot and cross-grain were not distinct and

would not be readily noticed. This side was up when plaintiff used it.

The testimony on the part of the defendant as set out and as claimed by appellant's counsel tended to show that there were a number of gangs of workmen at work in defendant's plant, each under its own foreman and all under a common superintendent. Said gangs were the carpenter gang, steamfitters' gang, ironworkers' gang, concrete-workers' gang, etc. Scaffolds consisting of supports and coverings were in use throughout the extensive premises of defendant's plant. The supports of each scaffold were originally put in position by the gangs as they went about. Such supports would often be left in position and a subsequent gang would use them. Normally a gang that finished doing work at a given place would remove the planks or covering of the scaffold structure, but leave the scaffold proper or supports, and the next gang coming along would select its own planks and place them upon the said supports. This was done by the gang in which plaintiff worked as well as by the other gangs. If a gang should reach a place where scaffolds as well as planks were already in position, they could use same or could substitute others. The members of each gang could do anything that to them seemed necessary to accomplish the work.

At the close of the testimony the defendant interposed a demurrer to it which the court overruled, defendant excepting.

At the instance of plaintiff the court gave three instructions, the first being a general instruction covering the case. As it is rather long and only one feature of it is complained of, we give substantially the context to bring out the part complained of. After instructing the jury to the effect that if they found that plaintiff was in the service of defendant and that there was a scaffold in the tower having a platform composed of planks and that plaintiff was on the platform at his work and

while thereon one of the planks broke and caused plaintiff to fall and sustain the injuries complained of, and if they find that the plank contained a knot and was cross-grained and thereby was not reasonably safe for use in the platform and was insufficient in the platform to bear the weight of plaintiff and hence broke, and if the jury find from the evidence *"that defendant provided and furnished said plank for use in said platform,"* and knew or by the exercise of ordinary care would have known that the plank was not reasonably safe for use in the platform and insufficient in the platform to bear the weight of plaintiff and of the danger of injury to plaintiff from being on the plank in the platform *"before it provided said plank for use in said platform*; and if the jury further find from the evidence *that defendant in furnishing and providing said plank for use in said platform* failed to exercise ordinary care, and that such failure, if the jury find from the evidence there was such a failure, directly caused the injuries to plaintiff," and if they find plaintiff was exercising ordinary care at the time he was injured "and at the other times mentioned in the evidence prior thereto," etc., then the jury will find for plaintiff.

The defendant prayed the court to give an instruction, marked "Instruction C," which the court refused to give, defendant excepting. At the instance of defendant the court gave four instructions. In the view we take of the case it is not necessary to set out any of them.

The jury returned a verdict for plaintiff in the sum of $2500, nine of the jurors concurring, and in due time thereafter defendant filed its motion for a new trial, which being overruled and exceptions saved the case is duly here on defendant's appeal.

REYNOLDS, P. J. (after stating the facts).—The errors assigned in this court by counsel for appellant

are, first, that the court erred in refusing to give an instruction in the nature of a demurrer to the evidence asked by appellant; that it erred in refusing to give the instruction marked "Instruction C;" and that the court erred in giving the first instructions asked for the defendant. The objections urged to the first instruction are to the words which we have italicized, that is to say, to the words in that instruction which told the jury that they could find for plaintiff if they found that he had been hurt and "that defendant provided and furnished said plank for use in said platform," and the words further along in that instruction, "and if the jury further find from the evidence that defendant in furnishing and providing said plank for use in said platform failed to exercise ordinary care." It is objected to these clauses or phrases in this instruction that they assume that the defendant had provided and furnished the plank, the breaking of which was the cause of the accident, and it is insisted that there is no evidence in the case that the defendant had provided and furnished said plank for use in this platform. We think that this criticism of the instruction is valid and that the presence of these words in this instruction was harmful error. The evidence shows very clearly that plaintiff and his fellow-workmen, pipefitters, picked out and selected these planks themselves. Neither of the vice-principals, Tenney or Saffley, was present when they selected these boards. All the direction that these fitters had from either of these men was when they were through working at one place to go to another where there was scaffolding and work there. The selection of the boards to go on the west scaffolding was left to them. They were not told by any one what boards to take nor where to take them from. When they got to this south scaffolding they found no platform and that the carpenters were about to remove the boards from the west scaffold and carry them to another platform or scaffolding. Gallagher, who, while apparently

the head of this particular gang of fitters—plaintiff and Altman being fitters' helpers, all of them practically fellow-workmen—asked the carpenters to leave them a couple of those planks which had been in use in the west scaffold. The carpenters did so and let them have two, which the fitters took from the carpenter as he was carrying them away and placed them in position on this south scaffold. One of them broke. There is no evidence that anyone who can be said to have been the representative of defendant furnished these particular planks to these fitters, with which to build this platform on which they were to work. So that these words, as used in this instruction, in leading the jury to believe that under the law and the facts they had a right to assume that the employer had furnished the defective board, were without evidence to support them, were misleading and should not have been used. Moreover, the employer is responsible only when either actual knowledge of the defective tool or appliance is brought home to him, or such facts are in evidence as warrant the jury to assume that he has or should have such knowledge. The employer is chargeable with notice and knowledge of those things which he ought to know. No such actual or constructive knowledge is, in this case, brought home to the employer. No one authorized by his position or employment to represent the employer knew that these men were about to use this board. Nor is any knowledge of its defective condition brought home to defendant. Its selection and use were one act—no time intervening in which any one representing the defendant could know either fact. [Burnes v. Kansas City, Ft. S. & M. R. Co., 129 Mo. 41, l. c. 52, 31 S. W. 347.] The defect in the board was one that plaintiff himself has testified could have been discovered on inspection; inspection would have shown it to have been defective and unsafe and unfit to bear the weight proposed to be put on it. It was a cross-grained, knotty plank. Plaintiff and his fellow-workmen selected it. Counsel on either

side refer to and quote from Bowen v. Chicago, B. & K. C. Ry. Co., 95 Mo. 268, 8 S. W. 230, in support of their position. Learned counsel for appellant quote from it that portion which is on page 277, commencing with the words, "A servant is not a mere machine, employed to drive a nail here or a spike there," and ends the quotation with the authorities cited in support of that proposition; while the equally learned and industrious counsel for the respondent quotes from the same case, commencing exactly where counsel for respondent left off on page 277, but quoting only the rest of it on that page. On the very next page, however, page 278, the court says: "Now in this case it is no part of the duty of the plaintiff to build or to keep the bridge in repair. Neither he nor his foreman had anything to do with it. It was held out to him as reasonably safe for the passage of construction trains, by the very act of taking him back and forth. The bridge was planned and built under the supervision of foremen, employed for that purpose. The acts of these foremen were the acts of their principal, and not the acts of a fellow-servant of the plaintiff." This language, taken in connection with the facts of the case, shows that the point in decision does not meet the case at bar. Here plaintiff and his fellow-workmen selected these boards themselves and put them into position. It is true, and necessarily so, that they selected them from material furnished by the master, the employer, but the evidence shows that there was a large quantity of boards available and serviceable for use and that the selection of the particular board was a matter in which neither the employer nor any of the foremen directly in charge of the work had anything whatever to do. It falls in a measure under the principle announced in that part of the opinion in the Bowen case which is quoted by counsel for appellant, to the effect that where the master employs competent workmen and provides suitable material for staging and entrusts the duty of erecting it to the workmen, as a part of the

work which they are engaged to perform, the employer is not liable to the workman for injuries resulting from falling off of the staging. "The negligence in such cases," says the court, "resolves itself into negligence of a fellow-servant."

The case of Forbes v. Dunnevant, 198 Mo. 193, 95 S. W. 934, is more nearly analogous in its facts to the facts in the case at bar. In that case it is said that the master may trust the servant to perform the intermediate, the ordinary and simple duties incident to the servant's employment and rest upon the servant's knowledge and skill. "The master buys a mass of raw material—some bad, some good." But says the court, "must he be present in person, or constructively, at every precise moment of time to select and deliver to that carpenter a sound board, so that the carpenter will not hurt himself or fellow-craftsmen or may he trust that carpenter to select a good board from the mass of raw material? We think there can be but one answer to this question."

We are referred to the cases of Combs v. Rountree Const. Co., 205 Mo. 367, 104 S. W. 77, and Kennedy v. Laclede Gas Light Co., 215 Mo. 688, 115 S. W. 407. On an examination of those cases, we do not think that the facts in them are applicable to the case at bar.

Our conclusion upon the whole case is that the demurrer to the evidence at the close of the case should have been given, on the ground that there was no evidence in the case on which the liability of the employer, defendant in the case, can be attached to make it responsible for the selection of the board, the breaking of which was the cause of the accident. Plaintiff's own testimony fails to establish knowledge of the defect on his employer, and further shows that he and his fellow-workmen—without direction from the employer, selected this defective board; that without any examination of its condition he used it, and that the slightest inspection on his part would have shown him that it was

unsafe. So that by his own carelessness he caused his hurt.

The judgment of the circuit court is reversed. *Goode, J.,* concurs; *Nortoni, J.,* dissents.

## DISSENTING OPINION.

NORTONI, J.—The question in this case is a close one but I incline to the opinion it was for the jury. The facts in proof do not disclose a case where the master has furnished a considerable quantity of lumber out of which the servants are to select boards for scaffolds but, instead, it appears there were several scaffolds theretofore constructed by the carpenters and then standing. Further, plaintiff testified he and his companions were neither expected nor required to build the scaffolds.

It is conceded defendant's foreman, Tenney, instructed plaintiff and his companion steamfitters to use the standing scaffolds in performing their task of fitting steam pipes. Tenney was not a fellow-servant of plaintiff but, on the contrary, was the master's representative, and it seems to me that his direction to plaintiff and his companions to use the scaffolds then standing involved an assurance of the master to the effect that they were reasonably safe for the purpose intended. This, of course, involved the idea that the boards on top of such scaffolds on which the men were to stand and walk were reasonably safe for the purpose as well. It is true plaintiff was not injured by falling from a scaffold pointed out by Tenney, but he was injured by the breaking of a board in use on such scaffold though it had been removed a few feet away by plaintiff and his companions to another scaffold where they were then at work. Having completed the task on the scaffold immediately west, they removed the boards from it to the theretofore uncovered scaffold on the south of the coal tower, and it was on this scaffold the board broke which

resulted in plaintiff's injury. But the board was one in use on the scaffold pointed out by Tenney.

It seems there were scaffolds intact, that is, properly covered with boards, and others standing without such covering at the time Tenney gave the general order to the steamfitters to use the same. Of course, the only way the steamfitters could use the uncovered scaffolds would be to cover them with the lumber from those on which they had been working, and it is clear that Tenney, the foreman, directed the use of such lumber on the scaffolds where it then was. Besides, plaintiff testified that it was no part of the duty of himself or companions to build the scaffold. It seems to be a fair construction of Tenney's order that the steamfitters should remove the covering boards from the other scaffolds and place them upon the one from which plaintiff fell, otherwise the order was insufficient to the end in contemplation. Thus viewing the testimony, I am of opinion that it was for the jury to answer whether or not defendant furnished the board in question.

As to the contributory negligence of plaintiff, I think that, too, was a question for the jury. In the circumstances of the case, the particular board involved presented no such features of danger as to threaten imminent peril. Others having used it in the scaffold then standing, an ordinarily prudent person would not scan it for defects as closely as he might on selecting it in the first instance. Then, too, it seems to have been rough on one side and discolored by use on the other so the knot which occasioned its breaking was concealed. I am persuaded the defect in the board was one not likely to be disclosed upon such an inspection as an ordinarily prudent workman would make in the light of the circumstances that he and others had immediately theretofore safely used it in the standing scaffold for the same purpose. It is entirely clear to my mind that plaintiff should not be adjudged guilty of contributory negligence as a matter of law.

Though it may be conceded, the question as to whether defendant furnished plaintiff and his companions the plank for scaffold purposes is a close one, I believe there is sufficient in the proof to send it to the jury. Entertaining this view, I respectfully dissent.

## ON MOTION FOR REHEARING.

### MAY 31, 1910.

REYNOLDS, P. J.—In his motion for rehearing, counsel for appellant relies mainly upon the dissenting opinion of our learned and careful associate, Judge NORTONI, as grounds for sustaining that motion. While recognizing the great care of our learned associate in all matters coming under his observation, we are compelled to say that we think he has misunderstood or inadvertently overlooked very material facts in evidence. To demonstrate that, we consider it not out of place to supplement the statement of facts set out in the prevailing opinion in the case by the substance of a part of such of the evidence as covers the matter of these scaffoldings and the boards and flooring a little more fully than we did in that opinion. We use for this the respondent's additional abstract of the record, in which he has set out verbatim the testimony of the plaintiff and of most of his witnesses. It is to be understood that there were two sets of scaffolding in place, one on the west side of a coal chute, which is hereafter called the west scaffolding, the other on the south side of that chute, and hereafter called the south scaffolding. It is to be understood that in speaking of the scaffolding, reference is made to the uprights and crosspieces that composed the scaffoldings and not to the flooring upon them which had to be placed on the scaffolding, if not already there when the men went to work. The selection of boards, when there were none on the scaffolding, was left to the men themselves. It is important to keep

the distinction in mind between the scaffolding as in place and as it would be when used. That is, the scaffolds themselves were mere skeleton frames, composed of uprights and supports—the latter such as joints in buildings, the scaffolds not capable of use until flooring was laid on them on which the workmen, who would use them from time to time, were to stand. This flooring consisted of loose boards, not nailed on to the scaffolding. The practice, the usage, as clearly appears by the testimony, was that when a gang were to work on a scaffolding which had no flooring, the gang put down the flooring. No one directed them where to get the boards for the flooring. The gang of which plaintiff was one of the members had been working on the west scaffold. They had been told by Saffley, their immediate superior, that when they finished their work on the west scaffold, to move around on to the south scaffold and do certain work there. When the men went to this south scaffold they found it without flooring. It then became their duty to find and put on floor boards. Neither Saffley nor any one else told the gang where to get flooring. Plaintiff's own testimony is, to give his exact words, "When we got through on the west side we threw the two boards around and put the pipe on the south side." Asked what boards they had thrown around, he said, the boards they had been using that were on the west scaffolding. These were two of the six boards the carpenters were in the act of removing, in fact it appears they had removed them, and not knowing that the fitters or others would want to use the west scaffold any more, were in the act of carrying them away, and as stated before, on the request of the fitters, let them have the two they had in their hands. These boards were two inches thick, six inches wide and fourteen feet long. They were loose boards. Asked after they got through on the west side what they then did, plaintiff answered, "We shoved the two planks that were lying on top around to the south side, to get on, and

put up that pipe." That is, they took two of these boards that had been on the west scaffold for use on the south scaffold. There were only *two* supports (joists) in the scaffolding to the south. The distance between these two supports on the *south* side, according to the plaintiff's testimony, was between seven, eight or nine feet, not over nine feet, *about nine feet,* he said on cross-examination. The supports on the west scaffolding were *between seven and eight feet apart.* On the west scaffolding there were *three supports* or joists. That is, when these boards, fourteen foot planks, were in place on the *west* side, they rested on *three supports, seven or eight feet apart,* but when they were carried around to the *south* scaffolding, they rested on only *two supports,* which were from *eight to nine feet apart.* When these planks were in place on the west side, the two boards selected appear to have been on top of other boards,— plaintiff speaks of taking them "from the top," of that west scaffolding, and were supported in the middle by the *third* support or joist which that scaffolding had, the other two supports, of course, being at either end of the planks. When these two boards were removed from the west to the south scaffolding, there were but two supports under them, one on each end and none in the middle. So that it is very evident that the two supports on the south scaffolding, on which the boards rested, were farther apart by at least a foot, possibly as much as two feet, than were the three supports in the west scaffolding. Plaintiff himself testifies that when the boards were laid on the south scaffolding *they projected over* the supports about two feet on one end and about three or three and a half feet on the other. When the plank broke which had been taken from the west and put on the south scaffolding, plaintiff was about the middle of it, consequently standing where there was the most strain and the least support to the plank, which before that had not only been supported in the middle by the middle joist, when it was on the

west scaffolding, but when as there used had apparently been on top of other boards. With this statement of the facts, as testified to by the plaintiff himself, which facts have evidently escaped the attention of our learned associate, a very different situation and use is presented as to this plank when on the west scaffold from that which arose when it was put to use in the south one. It cannot be argued that the plank which was the cause of the accident was used in the same manner that it had been used when on the west scaffolding. It may have been and was safe as used in the west; it broke when used under entirely different conditions in the south. In other words, when it was in place on the west scaffolding, it appears to have been on top of other planks and it certainly was supported through or under the middle, by a joist; when it was in place on the south scaffolding it was unsupported in or under the middle and rested on but two supports or joists. And plaintiff and his fellow-workmen selected and put it in place themselves, knowing how it had been before then used and supported. It follows from this, in our judgment, that because plaintiff and his fellow-workmen had used it with safety on the west scaffolding, they had no right to assume and it did not follow that they could use it on the south scaffolding, aware as they were of the difference in the construction of the two scaffoldings; differing in so far as strength was concerned and so far as support of the plank or flooring was concerned, and, according to plaintiff's own testimony, as we understand it, when this plank was in use on the west scaffolding it was given the added support and strength afforded by another plank under it. Hence, the inference sought to be drawn from the fact that because it had been safely used in one scaffolding plaintiff was warranted in using it in the other, falls, as the conditions were entirely different.

Our learned associate is also under a misapprehension as to the testimony in the case when he states that

there were no other planks or boards that could have been selected by this gang of fitters. It is true that other planks were not upon the floor upon which they were working, but it is also admitted by plaintiff himself that on the floor below was a large quantity of material at their use and from which they could select flooring, and which they could easily have hoisted up to the floor where they were, as the appliance for hoisting seems to have been there, plaintiff himself admitting this. The fact that the plaintiff and his fellow-workmen selected these two particular planks obviously was because they happened to be nearest and easiest. No one directed them to take them. All that the foreman told them was when they finished at one scaffold to go to another. Neither he nor any one else said a word by way of direction as to the building or placing the floors. In point of facts the boards about to be removed from the west scaffolding by the carpenters, who intended using them in another place, were being carried away by the carpenters, when plaintiff and his co-workers, obviously to save themselves labor and to save time, asked the carpenters to turn them over to them,—to let them have them. Whereupon they took them and put them in place or were putting them in place themselves, when the accident occurred. With these facts in the record, other facts being as stated in the first opinion of the majority, we see no reason to change the conclusion before announced. In addition to the cases cited in the first opinion we refer to Fraser v. Red River Lumber Co., 45 Minn. 235 and Hoar v. Merritt, 62 Mich. 386, as applicable in many of their features to the facts in the case at bar and the decisions in which are in line with what we have announced. The motion for rehearing is overruled, *Goode, J.,* concurring, *Nortoni, J.,* dissenting.