## FORBES v. DUNNAVANT, Appellant.

**Division One, June 30, 1906.**

1. **NEGLIGENCE: Demurrer to Evidence.** Where a demurrer is offered by defendant to the evidence, any evidence offered by defendant contradictory of plaintiff's has no office, for plaintiff is entitled to have his evidence taken as true, and defendant's contradictory evidence as untrue, and he is entitled, in addition, to every reasonable and favorable inference of fact naturally deducible from his own testimony and the uncontradicted testimony of defendant.

2. ————: **Master's Duty: Delegation.** The master may trust his servant to perform the intermediate, ordinary and simple duties incident to the servant's employment and resting upon the servant's knowledge and skill.

198 Sup—13

3.  ———: ———: ———: **Carpenter.** A carpenter knows a good board as well as does his master, often better; and if the master furnishes him a pile of lumber from which to select the boards for the work immediately in hand and he selects an improper and unsound board, nails it to his scaffold, and the board gives way and injures him, it is his negligence and not the master's. The master is not required to be present, either in person or by his foreman, every time he selects a board from the pile, to see that he selects only safe and sound boards.

4.  ———: ———: ———: ———: **Fellow-Servant.** And if the selection of the unsound board from the pile of lumber from which the carpenter and a fellow-carpenter working with him in nailing on the boards to a scaffold obtained their boards, was made by the fellow-servant, the negligence was not the master's.

5.  ———: ———: **Scaffolds: Statute.** Manifestly the statute (sec. 6447, R. S. 1899) requiring "all scaffolds used in or for the erection . . of any kind of building to be well and safely supported, and so secured as to secure the safety of persons working thereon," was not intended to inure to the benefit of workmen engaged in the erection of the scaffold, but for others who might use it after it was constructed. And even if it inures to the benefit of those engaged in the construction of the scaffold, it would not charge the master with the negligence of a fellow-servant in selecting, to be used in its construction, an unsound and unsafe piece of lumber from a mass of material furnished by the master.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald,* Judge.

REVERSED.

*Seddon & Holland, McKeighan, Wood & Watts* and *Wm. R. Gentry* for appellant.

The court erred in overruling appellant's demurrer to the evidence. (a) Because there was no case made by merely showing the happening of the accident, as the doctrine of *res ipsa loquitur* does not apply in this case. Kimmer v. Webber, 151 N. Y. 417; Bowen v. Railroad, 95 Mo. 268. Before respondent was entitled to have his case submitted to the jury, it was incumbent

upon him to show some negligence on the part of appellant.  Harper v. Railroad, 187 Mo. 575; Chandler v. Glass Co., 174 Mo. 321.  (b)  Respondent proved the breaking of the board, and introduced some testimony to the effect that the board was worm-eaten, but he did not introduce a scintilla of evidence showing, or tending to show, that the breaking of the board was caused by the worm-eaten condition thereof.  The burden of proof was upon respondent to show, not only that the board was defective, but also to show that the breaking of the plank was directly due to such defect.  (c) But even had there been testimony that the breaking of the plank was due to its worm-eaten condition, the respondent was not entitled to recover because the evidence clearly shows that the duty of selecting timber from a large mass was placed upon the respondent's fellow-servant, Redford, who was charged with the duty of taking out suitable pieces and passing them up to respondent.  If, then, this piece which Redford selected out of the mass and passed up to respondent was defective and unfit for use, the negligence, if any, in selecting same and passing it up, was the negligence of a fellow-servant and not the negligence of the master. McCone v. Gallagher, 44 N. Y. Supp. 697; Herbert v. Wiggins Ferry Co., 107 Mo. App. 288; Richards v. Hayes, 45 N. Y. Supp. 234; Jones v. Packet Co., 43 Mo. App. 203; Kennedy v. Spring, 160 Mass. 203; Oelschiegel v. Railroad, 73 Minn. 327; Ferguson v. Galt, 27 Ont. App. 489; Ross v. Walker, 139 Pa. St. 42; Colton v. Richards, 123 Mass. 484; Kelly v. Norcross, 121 Mass. 508; Beesley v. Wheeler & Co., 103 Mich. 196; Howard v. Hood, 155 Mass. 391; Dewey v. Parke, Davis & Co., 76 Mich. 631; Adasken v. Gilbert, 165 Mass. 443; Fraser v. Lumber Co., 45 Minn., 443; Armour v. Hahn, 111 U. S. 313; Peschel v. Railroad, 62 Wis. 338; McGinity v. Athol Reservoir Co., 155 Mass. 183; O'Connor v. Rich, 164 Mass. 560; Johnson v. Boston Tow Boat Co., 135 Mass. 209; Miller v. Railroad,

175 Mass. 363; Allen v. Iron Co., 160 Mass. 557; Hoar v. Merritt, 62 Mass. 386; Cregan v. Marston, 120 N. Y. 568; Pfeiffer v. Dialogue, 8 Am. Neg. Rep. 90; Hayes v. Railroad, 17 Am. Neg. Rep. 542; Callahan v. Trustees, 180 Mass. 183. (d) Even if the board broke on account of a defect, and even if this particular board was supplied by appellant, appellant would not be liable unless he had failed to furnish sufficient suitable timbers. But there was no evidence in this case that appellant failed to furnish sufficient suitable timber.

*A. R. Taylor* for respondent.

(1) Upon this record there can arise but these material issues of fact: (a) The plaintiff affirms that the timber which broke and caused his injury was defective by reason of being worm-eaten and decayed. He supports this affirmation by the direct evidence of Redford, and the production of the timber before the jury, showing that the board was worm-eaten and doty or rotten. This the jury saw. This claim is also directly supported by the evidence of Joseph Eastman, an expert of wide experience, who, in substance, declares the timber unfit for use. The condition of the board was open and visible, and the same as when used. (b) The defendant denies that the board was unfit, but asserts that it was a proper board, and endorses its use—and claims that it broke by reason of improper nailing alone—thus taking out of the case all controversy as to any negligence of a fellow-servant in providing an unfit board when good ones were furnished by defendant. Defendant and his foreman both, in substance, say this board was one supplied by defendant for the very use to which it was applied. (2) If the above evidence for plaintiff were true the contention that a demurrer to the evidence should have been sustained is without any foundation. Appellant is mis-

taken in his statement of fact that plaintiff failed to show any evidence before the jury tending to prove negligence on the part of appellant. There was strong substantial affirmative evidence of negligence in providing this timber for such use, as set out above. The board before the jury, with the evidence of weakness it bore, was evidence of negligence of defendant when he admits he furnished it for the use to which it was applied. The case was then one properly for the jury. There was no question of a fellow-servant's negligence in the issue of providing the board when defendant and his foreman both say the board was one which was all right. If it passed through the hands of a fellow-servant this servant was doing their bidding. If the board was unfit, defendant assumes the responsibility. If appellant was negligent in providing this board and it broke by reason of its unfitness, and without negligence of plaintiff or others, it was no accident.

LAMM, J.—Dunnavant was a contractor in the erection of the Textile Building for the World's Fair Association at its grounds in the city of St. Louis in 1902, and is sued by Forbes, his servant, employed with others in the building of a scaffold to be used in the erection of said building. While thus employed, the scaffold broke and he was so injured by his resulting fall that no complaint is made over the amount of his verdict, to-wit, $7,500.

The gist of the paper issues follows: Thus, by the petition it is set forth:

"That whilst the plaintiff was on said scaffold in the due discharge of the duties of his service, one of the cross timbers in said scaffold broke and the plaintiff was caused to fall a great distance, about thirty-two feet, breaking both of the plaintiff's feet and crushing the bones of his left ankle and leg, causing such injury as to necessitate the amputation of plaintiff's left leg nine inches below the knee, and otherwise causing

great injury to the plaintiff, both externally and internally. And the plaintiff avers that said scaffold was caused to break and give way and injure the plaintiff through the negligence of the foreman of the defendant, and of the defendant, in failing to provide suitable material for the construction of said scaffold. That defendant provided for the construction of said scaffold timber, plank and cross timbers of inferior grade and entirely defective and insufficient for such purpose, being second grade lumber and weak and insufficient for said purpose; as the defendant and its said foreman well knew, yet negligently provided said material, lumber, plank and timbers for said purpose, which negligence directly caused and contributed to cause said scaffold to give way and break and cause said injuries to the plaintiff. And plaintiff avers that defendant was further negligent in failing to provide a suitable and safe place where the plaintiff was to work in the discharge of the duties of his employment, which negligence also directly contributed to cause the plaintiff's said injuries.''

The last charge of negligence, to-wit, negligence in providing a suitable and safe place, was attacked, *nisi,* by a motion for a rule and order requiring plaintiff to make the same more definite and certain, for that (the motion says) it ''is indefinite and uncertain and does not state in what respect the place furnished by defendant to plaintiff was not suitable and safe.'' This motion was sustained. Plaintiff, declining to further plead, stood on his petition, filing a term bill of exceptions. As plaintiff did not appeal, his exception is not here and the averment in question must be taken as out of the case.

And by an amended answer, the defenses set forth, were: (1) a general denial, (2) plaintiff's contributory negligence, (3) that the details of the surroundings were open and obvious, were known to plaintiff, and the dangers, if any, in working amid said surroundings

were also known to him and he assumed the risk, and (4) that his injuries were the result of the negligence, carelessness or misconduct of other servants in the employ of defendant engaged in a common service with plaintiff.

The reply was a general denial.

On a trial to a jury, the verdict was as said. Thereat defendant filed his motion for a new trial, and, the same being overruled, excepted, and brought the case here by appeal.

The cause is here on assignments of error predicated of the giving of certain instructions for plaintiff, and of the refusing of an instruction for defendant in the nature of a demurrer to the evidence.

If it was error to refuse the demurrer, then a consideration of other assignments is *in nubibus*. In this view of the case, any evidence offered by defendant running counter to plaintiff's has no office; because plaintiff, on demurrer, is entitled to have his evidence taken as true, to have the evidence of defendant, where contradicted, taken as untrue, and is entitled to every reasonable and favorable inference of fact naturally deducible from his own testimony or the uncontradicted testimony of defendant.

One Redford was a "partner" of, *i. e.,* worked as a carpenter with, plaintiff in building the scaffold. Evidence was introduced on the issue whether plaintiff and Redford were fellow-servants. This evidence needs no attention, because it not only sufficiently appears they were fellow-servants, but the cause is submitted here substantially on that theory by both sides, and that one Lederer was foreman. Hence, this feature of the evidence is of no value and may be omitted.

In passing, it may be further said there was evidence pro and con upon the issue of fact as to whether the "ledger" or cross-piece, nailed to uprights and which gave way, to plaintiff's hurt, was negligently nailed or not. Defendant bases one of his defenses on the

theory that the ledger split from nail holes in the end; that in driving nails plaintiff improperly grouped them together and so negligently drove them as to cause the ledger to split and give way—*contra,* it is insisted by plaintiff that the ledger was weakened by worm-holes and by incipient stages of decay, and that the breaking of the ledger was caused thereby, but that the nailing was done with proper care. Directed to this issue of fact, testimony pro and con was put in. All this, in our opinion, was submitted to the jury and decided against defendant. Hence, we have nothing to do with it.

Defendant contends that plaintiff's principal witness, said Redford, so contradicted himself and, as we somewhat infer, exhibited such levity on the stand, that his testimony should be allowed no probative force. We do not understand the learned counsel for defendant to seriously press this contention, and the insistence arises more as a conclusion of our own than from the formulation of counsel. For instance, this witness made a former statement differing in essential particulars from his testimony on the stand. On cross-examination, being pressed on these contradictions, the following appears: "Q. Would your statement be different if you were under oath from what it would be if you were not under oath? A. Very likely it would be a little. Q. Then you never tell the truth, the whole truth, unless you are sworn? A. I guess that's a fact; now I have got to tell the truth. Q. At the time you made this statement on June 28, 1902, you were not telling the truth, is that a fact? A. I did not write that. Q. You signed it, didn't you? A. Yes."

Relating to the foregoing, possibly in counsel's mind, is the fact that said witness was not only an expert carpenter but seems to have been a wag as well. For, having testified in relation to a "ribbon" under the ledger, he was asked this question: "I thought you said a while ago it didn't have ribbon under

there?" To which he answered, "This end didn't, but that end did. . . . There is different ends on boards, you know. It wouldn't do to have both ends on one end."

But it goes without saying that the self-contradictions, if any, of this witness and his levity, if serious enough to command attention, as well as his subtlety in metaphysical distinctions between truth-telling off the stand and on the stand, were, one and all, for the jury and not for an appellate court in a law case.

With this clearing away of underbrush, to use a homely expression, the facts necessary in passing on the demurrer are as follows:

Plaintiff testified he was a carpenter and had been one for ten years, and, during all that time, had built more or less scaffolding; that he was in the service of Dunnavant on June 26, 1902; was engaged in the erection of a scaffold in connection with the Textile Building at the World's Fair Grounds. Said scaffold, at the time he fell, was thirty-two feet above ground and was intended to go to the ceiling in the pavilion to be used by plasterers and carpenters in putting on the ceiling. He had been building scaffolds for six weeks for defendant; was under one Lederer as foreman; the lumber was furnished by Dunnavant—was pine, commonly called Oregon pine. First class lumber is necessary for scaffolding. The scaffolds consisted of various floors, different heights from the ground and uprights. At the time of the accident, he was standing on a plank, resting on cross pieces, and this plank formed a part of the upper floor of the scaffold and was used to stand on. All at once, one of the cross timbers, under the plank, broke. It was about eleven feet long, one inch thick and six inches wide, and plaintiff never saw the cross piece afterwards. The lumber used in building the scaffold did not look like first grade lumber. Witness fell thirty feet and was unconscious for a long time. He further testified to the ex-

tent of his injuries, the length of time he was in the hospital, his wages, expenses, etc., none of which is material here.

On cross-examination, he said the reason he didn't think the scaffolding lumber was first class, was because first grade lumber would not break that way. It was further shown by him that he had a helper, named Benton, and Benton was on top of the scaffold at the time; that there was another carpenter, named Redford, and he had a helper named Brown—and these four worked in one gang—Redford being the leader; that Redford selected the lumber out of a pile and passed it to Brown and Brown passed it up; that he and Redford were the only carpenters working in the building of the scaffold; that the planks in the scaffold were sawed on the ground and passed up to the top; that Redford did the sawing; that the lumber was originally piled on the ground outside the building and pieces were selected and brought in and put on the floor of the building, and then were taken from there and put in the scaffold. Some of Dunnavant's employees assorted the pieces and brought them in a wagon and they were taken inside. This wagon brought them from a big pile of lumber. When inside, Redford would assort them again, selecting what he chose, and hand the pieces, as selected, to his helper, who would pass them up to Forbes' helper, i. e., Redford culled the lumber after it got inside the building, and used his judgment in using it. Plaintiff further testified that he nailed on the end of the piece that broke and Redford nailed the other end—the plan of procedure being that after the lumber was sawed and passed up, Redford would come up and he and plaintiff would nail the boards in place. This duty required both and was performed by both. The scaffold, when complete, was intended to hold material used in the construction of the building, as well as the men engaged in putting the material in place. At the time

the piece broke, plaintiff was stooped over shifting the floor planks resting upon this cross piece.

By Redford, substantially the same facts were shown—in addition, that at the time he was on the ground at the foot of the scaffold; that the cross beam that broke was called a "ledger," and it and other cross-pieces were used to hold the floor planks. The ledger in question was taken out of a second class lumber pile — was worm-eaten and "dozed." Witness identified the ledger in court. The worm-holes appearing in the ledger in court were the same as they were at the time of the accident, and the dozed appearance of the wood is the same. By "dozed" witness meant soft with age—elsewhere he explained it thus: "dozed is kind of soft wood, starting to rot, got them symptoms in it." Before the accident, at a time not located, witness told defendant "the lumber was not fit to put in the scaflold because it was knotty and dozed and worm-eaten." When witness told defendant that, defendant replied: "Go to that second class pile up there and pick the best out of that." Witness had long been engaged in building scaffolds and said first class lumber was needed. He spoke only once to Dunnavant, but he spoke to the foreman, Lederer, and called his attention several times to the bad condition of the lumber. When he did so, Lederer told witness "to pick out the best of it, use what he could and throw the rest away."

On cross-examination, it appeared he had been a carpenter twenty years, and had good eyes, could see without glasses. Having testified in chief that the worm-holes in the broken ledger showed on the outside, i. e., were visible to the naked eye, he was asked if he had noticed at the time he passed the plank up to plaintiff that it had worm-holes and was "doty," and he answered he couldn't remember whether he noticed the holes or not; that he wouldn't say he did or not; that he sawed the board in question; that he took the planks

out of the pile and cut them in lengths and then passed them up and would then go up and help Forbes nail them in place; that Forbes nailed the ledger on the end that gave way. As to talking to Dunnavant about the lumber not being proper, he said he couldn't tell what time it was, but it was inside of a couple months before the accident. He said he was referring in his talk to the ledger lumber, but he also said "it was before that board ever showed up at all"—meaning before the ledger that broke came upon the ground. At this stage, the court remarked: "That inquiry is not material if it relates to entirely different lumber and not lum-in this scaffold at all." Witness said he didn't see the lumber come in; didn't know whether it came all at one time or not. He further testified that his talk with Lederer about the lumber referred to another scaffold, except a conversation right before the scaffold fell. Lederer then said, "I will be over right away," and when witness got there, the scaffold fell.

By one Brown, it was shown that instructions were given from Lederer to plaintiff and others handling lumber to take out all the bad lumber and throw it to one side and pick out the best material and use it, which was done. It was shown, furthermore, that sometimes Redford culled the lumber and sometimes Forbes did.

Such was plaintiff's case, in subtance.

On behalf of defendant, it was shown the scaffold was built of yellow pine; that after its completion, one Eastman used the scaffold in question to put on the staff on the Textile Building. He was a boss and his men used the scaffold; it was an excellent scaffold; they had on it sometimes 2,000 pounds at one spot; did $100,000 worth of work on that scaffold—meaning work on the building. This witness, on being shown the broken ledger at the trial, said he would have thrown that board out if he had been building the scaffold, and noticed the worm-holes.

By one Bollman, it was shown he was an expert

lumberman. Being shown the broken ledger, he said it was yellow pine and by the trade classed as "number one yellow pine fencing"—fencing, because six inches wide and one inch thick—No. 1, because a sound board —not a "clear," but a sound, board. By "clear" is meant clear of defects. There are three grades of clear lumber and the board in question is No. 1 common, *i.e.,* comes after "third clear." By "doty" is meant the first evidence of decay or rot. The board is not doty; the worm-holes do not affect the strength of the plank; thinks the board would have been no stronger if the worm-holes had been out of it; did not consider the board unsafe from the little worm-holes in it; would have been of a higher grade if the worm-holes were out; if the worm-holes were out it would be of a higher grade than is used in scaffolds; the highest grade of lumber is not used to tie scaffolds. On cross-examination, the witness said that decay or worm-holes or doty condition did not cause the board to break.

By one Gavin, it was shown pretty much the same as by Bollman. Further, that a pin worm-hole won't weaken the strength of a plank, that the pin worm-holes are pretty well scattered in the plank that broke and were so small they didn't amount to anything. On cross-examination, it was shown that fallen timber left on the ground too long commences to decay; that worms won't go into lumber that is dry and painted, but will go into a log; that the pin worm-holes had the same effect as sticking a pin into a board, and, if you drive enough pins into the board to destroy the fiber of the wood, you would weaken it, provided there were enough holes and they were large enough.

By Lederer, it was shown that "culling" means picking out the best material from that sent to the job. Redford was ordered by witness to pick out the best material and to use nothing but what was good. The lumber was culled from the pile on the wagon and then again culled in the building. Witness denied the con-

versation with Redford immediately before the accident relative to the character of the lumber. His account of it was that Redford said he didn't have material enough and requested witness to send more, which was done. Redford said he couldn't get enough from what he had to build the scaffold and witness told him he would send more material to pick from. Redford made no complaint at any time of the quality of the lumber supplied for the scaffold, but was told only to use good material and not to use any poor stuff.

On cross-examination, he said that the men were left to use their own judgments to put the scaffold up strong enough; that they were told what the scaffold was for and were told to put up a scaffold that would hold the work. Witness noticed the scaffold off and on but not at the time of the accident. It was left to the carpenters putting it up. Witness knew of no rotten timber that was sent to the men, but there were orders to the men that they were to sort out, and not use, bad material. The plank that broke had been in the scaffold about two hours.

By defendant, Dunnavant, it was shown that he ordered 200,000 feet of 1 by 6, twelve and sixteen feet long, of fencing No. 1; bought it in Omaha, Nebraska, and it came for the purpose of scaffolding; that clear lumber is never used for outside work; that No. 1 common is used; that the object in having the men select it from the pile was to leave the knots, so that they would not be carried to the place of the scaffold; that on the lumber piles there were no carpenters, simply laborers, but when material was hauled to the place of use, then the carpenters reculled it, selecting what they considered good enough to go into the scaffold. The carpenters were instructed not to use bad material. He also testified the worm-holes in the broken ledger were too small to do any damage, and he (with others of his witnesses) threw the blame on the way the ledger was nailed. The witness denied any conversation with Red-

ford about the character of the lumber. On cross-examination, he testified the tensile strength of the board in question was as great as any board witness ever saw, and other evidence produced by defendant was to the effect that the ledger was a good, safe board.

But, as said heretofore, there being evidence the board was unsound, it was for the jury to say whether they would believe plaintiff's witnesses or defendant's witnesses. One thing is clear, the board broke. To that extent, the thing speaks for itself. The cause of its breaking is a question. Plaintiff's theory was that the board was unsound; defendant's theory was that plaintiff nailed it negligently. The jury found for plaintiff and, necessarily, against defendant's theory. Hence, for the purposes of this case, the ledger must be considered unsound.

On this evidence, is defendant liable as a matter of law? We think not, and this for the following reasons:

I. In the first place, it is insisted by plaintiff's learned counsel that there is an admission in the case, arising as a sequence from a position taken by defendant, which admission does away with the necessity of considering the question of whether defendant negligently furnished a defective plank, or whether plaintiff's fellow-servant negligently selected a defective plank. In other words, plaintiff's counsel argues that the question of fellow-servant is not in the case—all of which comes about in this way: At the trial, defendant introduced evidence tending to prove the plank a sound plank. With such evidence lodged in the case, plaintiff argues it is tantamount to an admission that the plank was safe and was adopted by defendant, that is, furnished directly by defendant. The trouble with this contention is that it is as unsound as the plank itself. Under the paper issues, defendant was entitled to show the plank was sound. If he showed that, it

relieved him from liability, no difference who was directly instrumental in selecting it. If he failed to show that (as he did, under the verdict), then he had left the other string to his bow, viz., that he did not furnish the unsound plank, but that plaintiff's fellow-servant voluntarily and unnecessarily selected it from a mass of lumber, which it is not pretended was all unsound and unsafe. We rule this contention against respondent.

II. It is next contended (as we understand it) in effect, that the duty of furnishing safe material for this scaffold could not be delegated by the master, and that if such duty was delegated the performance of that duty was still the master's act. Of which contention, it may be said the evidence is uncontradicted that a mass of raw material was furnished by the master for the use of Forbes and Redford in erecting the scaffold. And it is not contended that none of it was suitable. Redford selected a bad board from the lot which broke under the weight of plaintiff and his helper and badly injured plaintiff. Now, turn the matter as we may, at root, after analysis, the thing resolves itself into the question: Who selected that board? Was it the master, in contemplation of law, or was it a fellow-servant? If the master could not delegate the duty of selecting that particular board, except such delegation went *cum onere, i. e.,* burdened with responsibility for the selection, then the master is liable—otherwise, not.

In the exposition of this matter, as in other legal argumentation, it is safe to recur to first principles. The law is theory, but not theory alone. It is a practical, applied science. Its rules were invented by the wisdom of sages in ages gone to aid men in their business affairs. As these business affairs become complicated, under the evolution constantly going on, the law strives to keep abreast of the times in affording remedies for wrongs. When Appius Claudius built the

Appian Way, or the Egyptian kings the pyramids, there was a vast aggregation of labor employed, but the laborers were serfs, in a degree, and the rules governing their employment, autocratic, few and simple. Not so, now. Under modern conditions, the master may carry on a business over a vast field with thousands of employees in different branches of labor, widely separated, and his servants may never come under his actual eye. In this condition of things, looking at the matter from the master down to the servant, it has been said that the master may not delegate (and thus avoid) his primary duties in furnishing his servants a safe place and suitable and safe material and appliances, by merely giving general orders and directions, however wholesome and full, to others, who are foremen, *i. e.,* vice-principals. And such is the law. But, on the other hand, the law entertains another view, from another standpoint—a view that, beginning with the servant and considering him, looks up to the master. By this view, we start with the postulate that a servant is presumed to possess, not only common sense, but certain knowledge peculiar to his trade, or art. The master may be presumed to hire, not only the bodily services of the servant (his hands, eyes, ears, muscles and legs), but the skill and knowledge pertaining to the servant's art or trade and possessed by the latter. Hence, it is steadily held as sound law that the master may trust the servant to perform the intermediate, the ordinary and simple duties incident to the servant's employment and resting upon the servant's knowledge and skill. For instance, a carpenter knows a good board as well as his master, and in many cases, better. A master buys a mass of raw material—some bad, some good, a result incident to all buying by the quantity in market. Must he be present in person, or constructively, at every precise moment of time to select and deliver to that carpenter a sound board, so the carpenter will not hurt

198 Sup—14

himself or his fellow-craftsmen or may he trust that carpenter to select a good board from the mass of raw material? We think there can be but one answer to this question. Lord Coke says: "There are two instruments either to confirm or impugn all things—reason and authority." Certainly, reason is with the defendant in this case. The reason of the thing lies with the proposition that Dunnavant could properly trust the judgment of Forbes and Redford to select sound ledgers. Because, by the very act of hiring themselves to him, they held. themselves out as capable of doing that very thing. Authority lies the same way: Bowen v. Railroad, 95 Mo. l. c. 277; Herbert v. Wiggins Ferry Co., 107 Mo. App. l. c. 299 et seq., and cases cited; Allen v. Iron Co., 160 Mass. 557; Dewey v. Parke, Davis & Co., 76 Mich. 631; Beesley v. Wheeler & Co., 103 Mich. 196; Cregan v. Marston, 126 N. Y. 568; Callahan v. Trustees, 180 Mass. 183; Miller v. Railroad, 175 Mass. 363; Colton v. Richards, 123 Mass. 484; Johnson v. Towboat Co., 135 Mass. 209; O'Connor v. Rich, 164 Mass. 560.

See, also, the pronouncements of this court on a similar question — the non-reliability of the master where the servant, a miner, is intrusted with the duty of inspecting his own drill-holes. [Knorpp v. Wagner, 195 Mo. 637; Livengood v. Lead & Zinc Co., 179 Mo. 229; Fisher v. Central Lead Co., 156 Mo. 479.]

III. Finally, it is argued by plaintiff's counsel that the statute applies (Revised Statutes 1899, sec. 6447), the material part of which reads: "All scaffolds or structures used in or for the erection, repairing or taking down of any kind of building shall be well and safely supported, and of sufficient width, and so secured as to insure the safety of persons working thereon, or passing under or about the same, against the

falling thereof, or the falling of such materials or articles as may be used, placed or deposited thereon. . . ."

In the very nature of things this statute was not intended to inure to the benefit of workmen, fellow-servants of each other, charged with the duty of selecting sound material from a mass of other material and engaged in the matter of erecting a scaffold out of such selected material. The primary object of this law was that scaffolding should be so safely built that others, having no part in its building and in nowise responsible for its safe construction, when called upon to use such scaffolding, might not be injured. Take this case: if Eastman and the workmen under him had been injured by the scaffolds, falling because of negligent construction, and had sued, a different question might arise. But if the statute be held to apply to the workmen charged with its construction and while in the act of constructing it, and having the duty and power of selecting material, it could only apply in the sense that it is a statutory admonition to them to do their duty,— a duty inherent in things and present with them in the absence of written law,—and not erect a deathtrap for others to perish by.

We all agree that the injuries of plaintiff resulted from the negligence of his fellow-servant, Redford, and that, since this is so, the court erred in overruling the demurrer.

The cause is, therefore, reversed.

All concur.