**WATKINS v. JAHNCKE DRY DOCKS, INC.**

___

(December 16, 1929. Opinion and Decree.)
(January 13, 1930. Rehearing Refused.)
(March 10, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

___

McCloskey & Benedict, of New Orleans, attorneys for plaintiff, appellee.

Spearing & Mabry, and Wm. H. McClendon, Jr., of New Orleans, attorneys for defendant, appellant.

JANVIER, J. William B. Anderson, plaintiff's husband, died as the result of an accident sustained while he was repairing the rudder of a steamship on the dry-dock of defendant floating in the Mississippi river. It is thus evident that he was, at the time of the accident, engaged in a maritime occupation. Gray vs. N. O. Drydock & Shipbuilding Co., 146 La. 826, 84 So. 109. As he was engaged in a maritime occupation, the state's Workmen's Compensation Act has no application. Southern Pacific Co. vs. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C 451, Ann. Cas. 1917E, 900; Knickerbocker Ice Co. vs. Stewart, 235 U. S. 149, 40 S. Ct. 438, 64 L. Ed. 834, 11 A. L. R. 1145; Peters vs. Veasey, 251 U. S. 121, 40 S. Ct. 65, 64 L. Ed. 180.

But the fact that Anderson was engaged in a maritime occupation and that thus the compensation statutes of the state do not apply does not deprive the state courts of jurisdiction. On the contrary, the United States Supreme Court has several times held that the question of jurisdiction as between the federal courts and the state courts is not involved in matters of this kind, and that the state courts may decide the issues presented, subject only to the limitation that the remedy which the state court may afford shall be such remedy as is provided by the "common law" as distinguished from some special remedy furnished by particular legislation, such as state compensation statutes. The right in the state court to proceed with a matter of this kind results from the saving clause in the Judiciary Act of the United States of 1789, section 9, which is now contained in the third paragraph of section 256 of the U. S. Judicial Code (28 USCA sec. 371) which, in matters of admiralty and maritime jurisdiction, vests exclusive jurisdiction in the courts of the United States, but which saves "to suitors in all cases the right of a "common law" remedy where the "common law" is competent to give it."

The remedy afforded under article 2315 of our Civil Code is such a remedy as is contemplated as being afforded by the "common law" and therefore the state courts are not deprived of jurisdiction. In paragraph 3 of the syllabus in the matter of Messel vs. Foundation Co., 274 U. S. 427, 47 S. Ct. 695, 71 L. Ed. 1135, appears the following:

"Art. 2315, Louisiana Rev. Code, supra, furnishes the equivalent of a 'common law remedy,' saved to suitors in the state court by sec. 9, Judiciary Act of 1789, sec. 256 Jud. Code (28 USCA sec. 371) p. 433."

In that case the Supreme Court reversed the decision of the Supreme Court of Louisiana, which had held that the state courts were without jurisdiction. To the same effect is the decision of the Supreme Court of the United States in Panama Railroad Co. vs. Vasquez, 271 U. S. 557, 46 S. Ct. 596, 70 L. Ed. 1085, in which Mr. Justice Van Devanter said:

"The sole question presented is whether state courts may entertain such actions, the defendant's contention being that they are cognizable only in the federal District Courts. * * *

"This clause is a continuation of a like clause in the Judiciary Act of 1789 * * *

and always has been construed as permitting substantive rights under the maritime law to recover money for service rendered, or as damages for tortious injuries, to be asserted and enforced in actions in personam according to the course of the common law. * * * And it uniformly has been regarded as permitting such actions to be brought, in either the federal courts or the state courts, as the possessor of the right may elect."

It thus appears that plaintiff's action was properly brought in the state court, but that she can recover, if at all, only through article 2315 of the Civil Code, and not under the compensation statutes of Louisiana.

Deceased, Anderson, was in charge of a gang composed of himself and two assistants. Their work required them to be on a scaffold which was constructed of four stepladders about 19½ or 20 feet high, across which certain boards or planks had been placed. There were two ladders on each side of the vessel, and some of the boards extended from ladder to ladder, while others ran across from the boards on one pair of ladders to the boards on the other pair. As a result of the breaking of one of the boards on which Anderson was standing, he fell about 20 feet to the floor of the dock and sustained the injuries from which he died nearly two weeks later.

Plaintiff, widow of the deceased, charges that the master, Jahncke Dry Docks, Inc., is liable because it failed to furnish to Anderson a safe place to work. Defendant contends that the construction and altering of the scaffold were entirely within the scope of the duties of Anderson himself; that all the necessary material was furnished for the purpose; and that if he, in arranging the decking of the scaffold, used material that was patently defective, the cause of the accident was his own carelessness in this regard.

The evidence convinces us that it is quite true that these scaffolds are not only temporary in the extreme, but that they must, from time to time, be moved and altered during the course of each particular job, and that it is the duty of the crew engaged in the particular job to do the necessary moving and altering.

It became apparent that the planking on which Anderson was working was not sufficiently wide to afford him reasonable safety, and he caused his two helpers to descend to the deck of the dry dock to select and hand up to him additional planks.

Near the ladders there were a few planks, and at about 50 or 75 feet away (so defendant claims) there was a pile of others of various sizes and grades. Anderson's helpers handed him a plank which was near the ladders, but he, noticing a knot almost entirely across it, rejected it. His helpers then went to the larger pile of lumber to make a better selection. When they returned someone had placed in position across the ladders boards where it was intended that those for which they had gone should be placed, and they did not hand up the ones which they had brought. A short time later one of the boards, which had been handed up and placed, broke and Anderson fell.

Plaintiff charges that one Stinespring, who was superior in authority to Anderson, had ordered the particular board to be placed on the scaffold, and she claims that Anderson was justified in relying on Stinespring's superior judgment. Stinespring denies that he had anything to do

with the board and states that he was working on the other side of the vessel.

There is really no serious dispute as to the law applicable to this case. Of course, the general rule is that the master must furnish a safe place to work, but it is equally clear that, if it is the duty of the particular servant to prepare the place in which he is to work and proper materials are supplied him, he cannot complain if, as a result of his own neglect, the place in which he works is not safe. As was well said in Griffin & Son vs. Parker, 129 Tenn. 446, 164 S. W. 1142, 1144, L. R. A. 1917F, 497:

"The general rule is that an employer is bound to use reasonable diligence to furnish the employee a safe place and safe instrumentalities for the work to be done; but an exception exists in case of a scaffold where the employer supplies ample material of good quality and competent labor for the construction of such appliance, which he is not required to furnish in a completed state, and which the employees, within the scope of their employment, are themselves required to construct. In such case the employer is not liable to one of the workmen for the negligence of a fellow servant in the construction of the scaffold."

If the negligence of a fellow servant under such circumstances would deprive the injured party of the right to recover, his own negligence would operate even more effectively as a bar to an action of this kind, if in fact Anderson had anything to do with the alterations.

But it is contended that, although Anderson ordinarily had full authority to repair and alter the scaffold, it was done in this case by Stinespring, his superior, and without the knowledge of Anderson.

We find the evidence in the record quite confusing. A large part of it consists plainly of hearsay. Most of the testimony of Cox as to what Anderson told him several days after the accident is conceded to be inadmissible. However, Cox testified that he had repeated to Stinespring Anderson's statement as to the cause of the accident and that he (Stinespring) had said that "that was true, that that particular plank should not have been used and would not have been used, but they were short of material at that particular time." When Stinespring's testimony was taken by commission, he stated that he had had nothing to do with placing the board. Therefore the testimony of Cox in that regard was admissible, not for the purpose of proving the fact that Stinespring had ordered the board placed, but solely for the purpose of attempting to impeach Stinespring.

The statement that they were short of material, which is attributed to Stinespring by Cox, is, in effect, denied by the testimony of the witnesses who went to the other lumber pile and state that they secured suitable boards. Then, too, defendant contends that even if there was a shortage of proper material, and even if Stinespring did order the board to be used, this did not relieve Anderson, a man of discretion and having authority, of the duty of exercising common sense, and did not justify him in blindly assuming that the board placed in position by his superior was sufficiently strong for the purpose for which it was intended. In support of this contention counsel cites the following:

"* * * A servant is presumed to possess, not only common sense, but certain knowledge peculiar to his trade or art. The master may be presumed to hire, not only the bodily services of the servant

(his hands, eyes, ears, muscles, and legs), but the skill and knowledge pertaining to the servant's art or trade, and possessed by the latter. Hence it is steadily held as sound law that the master may trust the servant to perform the intermediate, the ordinary and simple, duties incident to the servant's employment and resting upon the servant's knowledge and skill. For instance, a carpenter knows a good board as well as his master, and in many cases better. A master buys a mass of raw material, some bad, some good—a result incident to all buying by the quantity in market. Must he be present in person, or constructively, at every precise moment of time to select and deliver to that carpenter a sound board, so the carpenter will not hurt himself or his fellow craftsman, or may he trust that carpenter to select a good board from the mass of raw material? We think there can be but one answer to this question." Forbes vs. Dunnavant, 198 Mo. 193, 95 S. W. 934, 938.

In Connelley vs. Southern Pacific, 140 La. 120, 72 So. 829, 832, the Supreme Court of Louisiana considered a case the facts of which were in many respects similar to those involved here. The question presented was whether the man working on the scaffold had selected the material, or whether he had been ordered to use it by a superior. Under the facts of that case the court found that the man himself had selected the material and, in discussing the legal question presented, said:

"The doctrine whereby the master is held to the exercise of superior intelligence in regard to the danger which may threaten the servant does not go to the extent of requiring that a man of mature age and apparently fair intelligence should be regarded as incapable of distinguishing between a broken and rotten plank and a sound one."

But whether or not the circumstances were such that a man of Anderson's experience should have noticed the defect in the board is entirely a question of fact, as is the question of who in fact placed the board, or ordered it placed. The testimony on these points, as it appears in cold type in the record, does not appear to us to preponderate either way, and therefore we do not feel justified in reversing the judge a quo, who saw the witnesses and was therefore in better position to weigh the evidence. The fact that the accident happened at night, and that therefore Anderson's vision was to some extent limited, and that consequently he did not notice a defect which in daylight might have been apparent, is a circumstance which was no doubt taken into consideration by the judge a quo.

Furthermore, the defense set up is in the nature of a special one, and thus the burden of sustaining it by a preponderance of the evidence is also placed upon the defendant. We do not believe that it has successfully borne this burden.

Since we believe that the defendant is liable, it becomes necessary for us to consider whether or not the amount allowed by the trial court, $7,000, is adequate. Anderson suffered considerably and did not die until nearly two weeks after the accident. He had been earning nearly $200 a month. His age was 52. Taking all these matters into consideration, we are of the opinion that the amount allowed was not sufficient and was somewhat below the amounts allowed in similar cases heretofore. It seems to us that $10,000 would be more nearly correct.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount thereof to $10,000, and as thus amended, affirmed.