WILLIAM MILLER v. ROY COLLINS, Appellant.—40 S. W. (2d) 1062.

Division Two, July 3, 1931.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau* and *Winston H. Woodson* for appellant.

*Clif Langsdale* for respondent.

DAVIS, C.—This is an action for damages for personal injuries growing out of the relationship of master and servant. The jury returned a verdict in plaintiff's favor and assessed his damages at the sum of $15,000. After an unsuccessful motion for a new trial, defendant appealed from the judgment entered on the verdict.

The evidence submitted in plaintiff's behalf warrants the finding that, on November 24, 1924, defendant was engaged in erecting, as general contractor, at 36th Street and Broadway, in Kansas City, a re-enforced concrete building, of the height of eight or ten stories, later known as the Hyde Park Hotel. Plaintiff was a laborer in defendant's employ. Relative to the first four floors, the concrete had been poured in forms and was in various stages of hardening, while the pouring of the fifth floor was then in progress. Seemingly the concrete of the ground floor had become hardened and the forms theretofore removed. The concrete, comprising at the same time the ceiling of the ground floor and the surface of the second floor, remained imbedded in the form. This form was comprised of 4 x 4 timbers, in rows about four feet apart, running the length of the

building, on top of which were laid seven-eighths of an inch planks. The form was held or supported by upright 4 x 4 timbers, between eighteen and twenty feet in height. They were grounded on the concrete of the ground floor at interspaces forming squares, three and a half feet apart, with short 4 x 4 timbers, three feet in length, at their apex. These uprights were known as T-shores, and they supported and rendered the form steadfast.

The concrete, comprising the ceiling of the first and the surface of the second floor, had become sufficiently hardened to permit the demolition of the form. Graham, the foreman, directed plaintiff and his fellow-workman, Ford, to wreck the form supporting said concrete ceiling and floor. He pointed to and directed them to wreck a certain portion of the form in an offset of the building, and to use the 4 x 4 timbers taken from the form for scaffolding. No other timbers were available. Other 4 x 4 timbers theretofore pulled down had been lifted to a floor above for use in a form. They began by knocking out the upright 4 x 4 timbers with sledges. Then by means of a ladder, they ascended to a beam eight feet north of the south wall. Using wrecking bars, at least forty-five inches in length, they pried out two rows of 4 x 4 timbers from the form. These timbers they laid from beam to beam, which were about ten feet above the ground floor. Across these timbers they nailed a 2 x 10 plank. This constituted the scaffold. While standing on this scaffold, plaintiff and Ford pulled from the form the 4 x 4 timbers. In doing so, it was necessary to reach upward with the wrecking bar. On pulling loose a certain 4 x 4 timber, to keep it from hitting him, it became necessary for plaintiff to step from the plank, on which he was standing, to a 4 x 4 timber comprised within the scaffold, in order to keep the 4 x 4 timber pulled loose from hitting him. The 4 x 4 timber pulled loose fell and struck the 4 x 4 timber constituting a part of the scaffold, and caused said 4 x 4 timber on which plaintiff was standing to break and plaintiff to fall to the concrete floor below, breaking the astragalus bone in his right foot.

Plaintiff's evidence further tends to show that No. 1 rough 4 x 4 timbers only were used to construct forms for concrete; that said 4 x 4 timbers were fashioned from live logs and were fit to use in a scaffold, because of their strength; that the 4 x 4 timber that broke was not a No. 1 rough 4 x 4 timber, but was cut from a dead tree and contained a cross-grain and several large knots, all of which rendered it weak and unfit to use in a scaffold; that carpenters were able to distinguish by reason of their training between good and bad timbers, and they were used by defendant to select the timbers comprising the forms which they constructed; that plaintiff and Ford were laborers and were unable to tell by appearance whether or not

the 4 x 4 timbers were No. 1 rough 4 x 4 timbers, or whether or not they were of sufficient strength to be used in a scaffold; that nothing appeared to them to advise that this 4 x 4 timber was not a No. 1 rough 4 x 4 timber, or a proper timber to use in the scaffold.

**Defendant's evidence.** Relative to the erection of the building, one Grable was the superintendent. He testified that carpenters are men trained in the use of wood, knowing good from bad timber, and that was why carpenters were used to construct the forms. He further testified that the 4 x 4 timber that broke was cut from a dead tree and that it was dangerous to use it in a scaffold; that timbers wrecked from the forms frequently fall on the scaffold.

Other facts will appear in the opinion.

I. In the beginning, we are met with a motion filed by defendant-appellant subsequent to the submission of the cause in this court, praying an order of discharge, which is predicated on his discharge in bankruptcy. Certified copies of the record of the District Court of the United States for the Western Division of the Western Judicial District of Missouri advise that, on July 3, 1930, defendant filed his petition therein and was adjudicated a bankrupt and that on November 10, 1930, he was discharged from all debts and claims provable and existing on July 3, 1930, excepting such debts as are by law excepted from the operation of the discharge in bankruptcy. Defendant scheduled as a liability plaintiff's judgment against him for $15,000. The abstract of the record herein shows, however, that, on September 6, 1928, long prior to the filing of his petition to be adjudicated a bankrupt, defendant filed an affidavit for an appeal in this cause and was allowed an appeal to this court. A document on file advises that defendant was insured against liability as to the claim of plaintiff against him by virtue of policy No. EC-406796, issued by the Globe Indemnity Company.

It was said in Marx v. Hart, 166 Mo. 503, l. c. 517-18:

"That it is a proper practice to file a plea of discharge in bankruptcy in this court, when the same is granted after the appeal is perfected, was decided in Haggerty v. Morrison, 59 Mo. 324, and the bankrupt may avail himself of it in this way. But the question whether the garnishees against whom a judgment had been rendered prior to the adjudication of the defendant's bankruptcy can invoke the protection of that discharge, is another proposition. Section 16 of the Act of July 1, 1898, establishing a uniform system of bankruptcy in the United States, expressly provides that 'the liability of a person who is a co-debtor with, or guarantor, or in any manner a surety for, a bankrupt, shall not be altered by the discharge of

such bankrupt.' " The foregoing provision is still in force. [United States Code, Title 11, Chap. 3, sec. 34.]

We are not advised as to the provisions of the policy issued by the Globe Indemnity Company or whether it contains a provision commonly called the no-action clause. It is intimated, however, that the Globe Indemnity Company took and had exclusive charge and management of this action. If so, notwithstanding a no-action clause, said company was a liability insurer and loss matures upon final judgment against the assured, for an assured is not protected against loss if he has to pay a judgment before he can recover against the insurer. [Brucker v. Georgia Casualty Co., 32 S. W. (2d) 1088.] It is unnecessary to determine specifically that the insurer is a co-debtor, or a guarantor, or in any manner a surety for the assured, but it is clear that the insurer falls within one of these classifications. However, we are inclined to the view that the status of a liability insurer against loss is that of a guarantor, guaranteeing to pay in the event of liability determined and predicated on a judgment. [Brucker v. Georgia Casualty Co., supra.] Consequently, the liability of the Globe Indemnity Company is not altered by the discharge of the bankrupt.

Having been discharged in bankruptcy, it is clear that defendant cannot be made to pay the judgment. This does not prevent this court, however, from affirming the judgment against defendant, with a perpetual stay of execution, so as to leave the plaintiff at liberty to proceed against the Globe Indemnity Company. [Hill v. Harding, 130 U. S. 699, 9 Sup. Ct. 725, 32 L. Ed. 1083; Dunham Bros. Co. v. Colp, 125 Me. 211, 132 Atl. 388, 7 Am. Bank Rep. (N. S.) 903; United States Wind Engine & Pump Co. v. North Penn. Iron Co., 227 Pa. 262, 75 Atl. 1094; Marx v. Hart, 166 Mo. 503, 1. c. 518, 66 S. W. 260.] Defendant's motion to discharge is overruled.

II. Defendant avers that plaintiff failed to make a submissible case. His contention is based on two postulates. His first contention hypothesizes the theory that it was a physical impossibility that plaintiff pulled a 4 x 4 timber from the ceiling twenty feet in height, with a forty-five-inch wrecking bar, while standing on a beam ten feet below. The second contention relies upon the ruling in Forbes v. Dunnavant, 198 Mo. 193, 95 S. W. 934, that absolves a defendant from liability because of injuries as the result of defective timbers selected by plaintiff or his fellow-workman.

(a) Plaintiff's fellow-workman, Ford, was five feet three inches in height. Plaintiff's stature was not developed. The height of the ceiling above the first floor was shown to be twenty feet. The beam on which the 4 x 4 scaffolding was placed was said to be ten feet above the first or ground

floor. The wrecking bar was at least forty-five inches in length. The reach of the arm above the head is about one and a half feet. As plaintiff was standing on a plank about an inch in thickness placed on the 4 x 4 timber resting on the beam, and as the planks constituting the bed of the form were also an inch in thickness, it is evident that the extent of the reach to the 4 x 4 timbers was only nine and a half feet. A man sixty-three inches in height, with an arm reach above his head of eighteen inches, is able to extend a forty-five-inch wrecking bar above his head to the height of one hundred and twenty-six inches or ten and a half feet. It does not appear with certainty that the 4 x 4 timbers comprising the form were incapable of being reached and pulled down in the manner described by plaintiff and his witness. The facts do not justify a ruling that the occurrence was a physical impossibility. In 10 Ruling Case Law, pages 1008, 1009, it is said: "It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue." Defendant has not demonstrated that the declarations were manifestly impossible, and, consequently, we must accept plaintiff's version of the evidence as true. [Laudwig v. Central Missouri Power & Light Co., 24 S. W. (2d) 625, l. c. 628.]

(b) The rule in Forbes v. Dunnavant, supra, that the master, out of a mass of raw material, partly defective and partly suitable for  the purpose intended, is not liable for defective timber selected by the servant and causing his injuries, is relied upon by defendant as absolution from liability. In that case, the servant and his fellow-servant were skilled carpenters, experienced in judging woods. By their trade as carpenters, in accepting employment, they held themselves out to be capable of distinguishing between defective and suitable lumber. They knew a sound board, suitable for the purpose intended, probably better than the master. They were hired for the purpose of exercising that judgment and relieving the master of numerous duties in that regard.

But, not so with the plaintiff herein and Ford, his fellow-servant. It is true that they were experienced laborers, yet they were merely laborers. They were not hired, nor did they hold themselves out, to be skilled and capable of judging between defective and suitable timbers. It was not their province to determine the soundness and strength of wood, nor did their experience as laborers justify any assumption or reliance in that regard. They were warranted in relying, as the evidence tends to show, on the facts that No. 1 rough 4 x 4 timbers were necessary and called for in the construction work, and that skilled carpenters, in erecting the forms, determined that

the timbers were sufficient in strength and quality for the purpose intended.

The evidence further tends to show that the foreman directed plaintiff and Ford to wreck and pull down a certain or particular portion of the form and to use the wreckings wrecked from the ceiling for scaffolding. There were no other 4 x 4 timbers or other timbers, than those they wrecked from the form, thereabout that could be used to build the scaffold. No. 1 rough 4 x 4 timbers are cut out of live trees and are not fashioned with a cross-grain and are without many knots in them. The evidence tends to show that the 4 x 4 timber that broke was not a No. 1 rough 4 x 4 timber, for it had not only been cut from a dead tree, but it had a cross-grain and contained a number of knots, all of which constituted it a weaker timber than a No. 1 rough 4 x 4 timber. Nothing in the appearance of the timber warned plaintiff or Ford, so they testified, that it was in any manner defective.

If defendant furnished the timber as described that broke, his negligence was a jury question. We think the evidence tends to show that he furnished it, for his vice-principal, the foreman, directed the use of the timber as it came from the form to build the scaffold. The workmen were not charged with a discretion in selecting timber to be used in the scaffold. Moreover, they did not hold themselves out to be capable of judging between good and defective wood, nor did their vocation charge them with that duty as it does a carpenter, as they were not directly or inferentially hired for that purpose. Not only were they authorized to rely upon the quality of the wood furnished, but they could, without notice to them to the contrary, put their faith in the previous selection of the timbers by carpenters of experienced judgment, hired for that purpose. On principle and on precedent, this case is distinguishable from Forbes v. Dunnavant, supra. It falls within the facts and rule enunciated in Baugher v. Gamble Const. Co., 324 Mo. 1233, 26 S. W. (2d) 946, as the evidence tends to show that the master furnished and selected for use the defective timber.

III. Defendant attacks the principal instruction given by the court to the jury at the instance of plaintiff. The instruction is lengthy and we find it unnecessary to quote it. Two complaints are directed to our attention, which we proceed to consider in order.

(a) It is contended that the instruction was intended to cover the whole case and failed to require a finding that the alleged negligence of defendant was the proximate cause of the injury. Defendant submits and plaintiff admits that it did not require the jury to find that the

negligence in furnishing said timber and its breaking caused plaintiff to fall to his injury.

That the failure of the instruction to require the mentioned finding was error is evident, unless it can be said that the omitted finding was not a contested issue. Of course, plaintiff's evidence tended to show the breaking of the timber, on which plaintiff was standing, thereby precipitating him to the concrete floor and injuring him. Defendant produced no witness who observed the timber break and plaintiff fall. However, defendant offered a witness, Grable, superintendent for defendant as to the construction of the building. The record shows that Grable testified on direct examination as follows:

"Q. Mr. Grable, were you superintendent of the Hyde Park Hotel? A. I was.

"Q. When Mr. William Miller fell there from the scaffold? A. I was.

"Q. Did you witness that accident? A. No; I did not.

"Q. Did you go out to the scene of the accident after it happened? A. Shortly after; yes.

"Q. Did any one show you where the accident happened, where Mr. Miller fell? A. Yes.

"Q. Who showed you? A. George Ford.

"Q. When you got out there did you find a 4 x 4 which had broken? A. Yes.

"Q. What did you do with that 4 x 4? A. I took it in the office and preserved it.

"Q. And do you recognize this as the 4 x 4? A. Yes, sir.

"Q. Where you put the letter 'X' is where the scaffold was? A. That is where the accident occurred.

"Q. That is where the accident occurred? Was the scaffold there? A. Yes; right over it.

"Q. Now you have placed the letter 'X' at the place where the scaffold was, and where you were shown by Mr. Ford where the accident happened? A. Yes, sir."

Witness further testified that plaintiff was brought to the office after the accident, and that he (witness) called the doctor and the ambulance. On cross-examination, witness stated that the falling of a timber, striking this 4 x 4 timber, broke it.

It may be well to state that the instruction required a finding that the 4 x 4 timber was furnished by defendant to plaintiff; that it was defective and unfit for scaffolding purposes, of which defendant knew or should have known. It may also be well to state that defendant answered that "defendant states that the timber which broke was selected and picked out by the plaintiff and/or his fellow-servant, George Ford, from a sufficient supply of good timber furnished on the job by the defendant."

For an instruction to assume an undisputed and a conceded fact is not reversible error. Many cases to that effect are to be found in our reports. [27 Missouri Digest, Trial, Key number 192, and cases cited.] In the instant case, however, a finding, generally essential, was omitted, not merely assumed. Logically, the jury are not required to find an assumed essential fact. Neither are they required to find an omitted essential fact. A finding of such essential fact in each instance is denied to the jury. We see no distinctive difference in the respective postulates.

Plaintiff's evidence, that he was standing on the 4 x 4 timber as and when it broke, thereby precipitating him to the concrete floor and injuring him, caused by the breaking of a defective timber, is undisputed. Defendant's evidence, set out *in haec verba* and otherwise, inferentially at least, concedes the facts. Neither in theory nor in reality, notwithstanding a general denial, did defendant dispute these facts. This is shown by defendant's answer and his interrogation of his witness by defendant's counsel. The record shows that defendant tried the cause solely on the theory that plaintiff selected the timber from a mass of material. We think that the omitted requirements were not contested issues, but that the facts were conceded. Defendant cites the cases of Lackey v. United Railways, 288 Mo. 120, 231 S. W. 956, Dunsmore v. Hartmann, 256 S. W. 1031, and Cassin v. Lusk, 277 Mo. 663, 210 S. W. 902, to support his theory. In those cases the omitted essential requirements in the instructions involved contested issues. The instruction criticised did not constitute prejudicial error because of the omission, for defendant did not assume to try the cause on the theory that the omitted findings were in issue. [Neal v. Caldwell, 34 S. W. (2d) 104, 1. c. 112.]

(b) The second complaint reads: "This instruction is also erroneous for the reason that it does not submit to the jury the question of whether or not the defendant had furnished to the plaintiff sufficient good material with which plaintiff and Ford could have built the scaffold." Defendant does not enlarge upon the postulate. As a predicate to plaintiff's recovery, this was not a required finding. Plaintiff averred and hypothesized his right of recovery on the furnishing of the timber by defendant. If this particular timber was furnished for the scaffolding by defendant and he directed plaintiff and Ford to so use it, it is immaterial that defendant had on hand other good lumber suitable for the purpose.

IV. Defendant asserts that plaintiff was injured by his own negligence, because he adopted an unsafe position by standing or

stepping over onto the 4 x 4 timber which broke, when he might have adopted a safe method. Plaintiff's evidence tended to show that he stepped and stood on the timber that broke to avert injury perchance from the timber that fell when he wrecked it from the form. There was nothing in the appearance of the 4 x 4 timber on which he stepped to advise plaintiff that it was defective and dangerous. He was in danger, as he thought, from the falling timber and a dilemma confronted him. That he erred in judgment, under these circumstances, cannot be charged as a matter of law against him. If he was guilty of negligence, it was at least a jury question. [Frankel v. Hudson, 271 Mo. 495, 196 S. W. 1121; Doyle v. St. Louis M. B. Ter. Ry. Co., 31 S. W. (2d) 1010, l. c. 1012-13; Bright v. Wheelock, 20 S. W. (2d) 684.]

V. It is averred that the court erred in limiting defendant in the use of depositions and transcripts of the evidence of two former trials with respect to the cross-examination of plaintiff's witness Ford.

Defendant's counsel read from the deposition of plaintiff and thereupon asked him if he had given that answer to the question, and plaintiff replied that he had. Counsel inquired, "Now, which do you say it was that he was pulling on?" Plaintiff objected because the matter was argumentative and a jury question as to whether the deposition contradicted Ford's testimony. The court sustained it.

Defendant's counsel also read from the transcript of Ford's testimony, and then inquired, "Now, what do you say, Mr. Ford, about the length of those four by fours in the two north rows?" Plaintiff objected on the ground that it was not proper cross-examination, and the court sustained it because it was repetition.

We need not discuss the contentions, except to say that, if the court improperly sustained the objections, its course in so doing did not constitute prejudicial error, for defendant's counsel read at length from the deposition and transcript and we feel certain that the jury fully understood whatever contradictions existed in the versions of Ford's testimony.

VI. Defendant complains of the argument of counsel for the plaintiff to the jury, asserting that it was prejudicial.

(a) The record shows that Grable, superintendent of defendant at the erection of the building, testified in behalf of defendant. One Graham, foreman of defendant at time the building was being erected, although he directed plaintiff and Ford to demolish the form and construct the scaffold, as plaintiff's

evidence shows, was not called to testify by either party. Graham, however, at time of trial, was in the employ of Grable, but was not then in court. Counsel for plaintiff argued that the only person able to contradict the testimony of plaintiff and Ford was Graham, and he was not produced.

We see nothing in counsel's argument to distinguish it on principle from the situation described in Bobos v. Krey Packing Co., 323 Mo. 224, 233, 19 S. W. (2d) 630, 634, notwithstanding defendant's contention that distinction exists, in that the witness was present during the trial in the Bobos case, while in this case no such showing obtained. Whether the failure to produce Graham as a witness militated against plaintiff or defendant, was on the facts a question for the jury. Either party could properly argue his respective contention to the jury.

(b) Counsel for plaintiff, in his argument, referred to the fact that one Dr. Carbaugh had not been produced as a witness by defendant. Grable, defendant's superintendent, testified that as soon as possible after plaintiff's injury, he called Dr. Nigro, with whom Dr. Carbaugh was associated, and that, upon taking plaintiff to the hospital in an ambulance, Dr. Carbaugh was the one that came out. If it does not directly so appear, it is inferable that defendant called Dr. Carbaugh to attend plaintiff. Plaintiff's foot was X-rayed under the direction of Dr. Carbaugh. Counsel for plaintiff stated that defendant's counsel in his argument asked, ''Why didn't you bring in the X-ray that was taken of the lateral view of this man's foot, and therefore there must be some reason why you did not bring it in,'' and plaintiff's counsel then iterated, ''If there was any contradiction about that or any doubt about this injury, why didn't they bring in their Dr. Carbaugh.'' We think plaintiff's counsel was justified in the argument. Just as happened in this case, the charge of the availability of the witness was open to either party, the subject of determination by the jury, and either party was authorized to comment on it. Of course, the right to make such comments depends upon the evidence as adduced.

(c) The evidence shows that a surgeon employed by plaintiff operated on his foot, and not deeming the operation sufficiently successful, he again operated. Defendant's counsel commenting on the operations in his argument said: ''In the first operation chisels the lower part of that bone away and then goes in in the second operation, gentlemen, and he not only chisels more of that bone away, but he cuts and slices off the heel bone which he admits was not injured a particle—just butchery, and I venture to say, gentlemen, that there will be a lawsuit against Dr.

———— for malpractice in this case. I never heard of such butchery in my life.'' In answering the argument, plaintiff's counsel said, and the following occurred: ''He received an injury that in the hands of their doctor caused him to be on crutches for two years and then use a brace that he has here, for a.long time.'' Defendant then objected on the ground that Dr. Carbaugh was not defendant's doctor and moved ·to discharge the jury. Plaintiff's counsel then said: ''He is your doctor. You surely do not deny that? You employed him and put him in charge of this case. Your superintendent says that he called him on this job to take care of this man and he was your doctor, and your objection is not an objection, but a mere interruption.''

We do not think the foregoing remarks constituted prejudicial error. It may be that plaintiff's counsel ought not to have said that ''your objection is not an objection, but a mere interruption,'' but it was said in the heat of trial and argument, not premeditatedly and deliberately. It appears that by the bandinage indulged in defendant's counsel rather invited the remarks.

VII. It is said that the verdict is excessive. At the time of his injuries, plaintiff was forty-one years of age and a strong, able-bodied man. He was earning six dollars a day. To the time of trial he had lost at least $4500 in wages. The bills for doctors, hospital and artificial appliances aggregated about $600. The injury was the breaking in several places of the astragalus or ankle bone of the foot. This bone rests on the *os calcis* or heel bone. He was treated by Dr. Carbaugh, but at the end of four months his foot was in mal-position, and he was unable to rest it on the floor. It lay on the little toe side. Before going to Doctor ————, it was advised that his foot be amputated. However, Doctor ———— performed two operations on it. In the first, he cut away a portion of the astragalus bone, but that operation was not wholly a success. In the second, he cut away a portion of the heel bone to exude a serum to cause the astragalus and *os calcis* to adhere to each other and become fixed. This was done to keep the broken bone from slipping, as the normal joint was destroyed. After each operation the foot remained in a plaster cast for months. A brace was provided, which he wore for nearly two years. In walking he used crutches. Two and a half years after the injury, he walked only with pain and could not walk, at any one time, longer than an hour. To the time of the trial he had not been able to work and earn money. He is a cripple.

It is evident that plaintiff has lost the mobility of his foot and that he never again can perform the work of an experienced laborer,

his vocation in life. He has lost in actual earnings and expenditures to the time of the trial, caused by his injury, more than $5,000. So far as his vocation in life is concerned, the leg has become practically useless. In a somewhat analogous case, this court permitted a verdict for $18,000 to stand. [Zumwalt v. Chicago & Alton Railroad Co., 266 S. W. 717.] It is evident that the damages awarded were not excessive.

The judgment is affirmed, with a perpetual stay of execution as against defendant. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.